C. WILBUR MILLER *v*. RICHARD M. PRESTON ET AL.
[No. 46, January Term, 1938.]

*Decided May 18th, 1938.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*Isaac Lobe Straus,* for the appellant.

*Stuart S. Janney,* with whom was *William F. Allen* on the brief, for Richard M. Preston, appellee.

*Charles McH. Howard,* for G. Ridgely Sappington, appellee.

*Robert R. Carman,* for James Bruce, appellee.

*Charles Markell,* for Henry E. Treide, appellee.

SLOAN, J., delivered the opinion of the Court.

The plaintiff, appellant, C. Wilbur Miller, sued Richard M. Preston, James Bruce, Henry E. Treide, and G. Ridgely Sappington, who are the appellees here and the only defendants summoned, and six other persons, and four nonresident corporations, upon whom there was no service of summons.

The declaration charges the appellees and Sir Auckland C. Geddes, William Sequine, Albert H. Wiggin, John N. Buchanan, Thomas Robbins, and John J. Watson, and Rio Tinto Company, Ltd. (of England), the Pyrites Com-

pany, Inc. (of Delaware), the Chase National Bank, a national bank (of New York), and the Continental Illinois Bank & Trust Company (of Chicago, Ill.), corporations, with "wrongfully and unlawfully" combining, confederating, and conspiring "each with the other to destroy, wreck, ruin, and impoverish the plaintiff financially and the plaintiff's financial standing and status, his reputation for ability, and his credit in the financial world; to cause him to lose his fortune, estate and property in order that they might eliminate and destroy him as the controlling Executive and Managing President and Director of the Davison Chemical Company" and of the Silica Gel Corporation, a subsidiary of the Davison Chemical Company, and wreck and ruin both corporations, "with the view, object and purpose of acquiring them or a controlling and dominating interest in them for the Rio Tinto Company, Ltd., * * * and in the furtherance, prosecution and execution of said unlawful combination, confederacy and conspiracy the defendants did destroy, wreck, ruin and impoverish the plaintiff financially and the plaintiff's financial standing and status, and his reputation for ability, and his credit in the financial world, and did cause him to lose and did deprive him of his fortune, estate, and property, and his property and investments in, and his position as the President and Executive head of the Davison Chemical Company and its various subsidiaries * * * whereby the defendant, Rio Tinto Company, Ltd., and the other defendants have wrecked and ruined the Davison Chemical Company and its many and various associated corporations, including the Silica Gel Corporation," etc. The four defendants who were summoned demurred to the declaration, and, the demurrer having been sustained without leave to amend, the plaintiff appealed.

The declaration, which covers twenty-nine printed pages of the record, is so full of details and generalties, in its narrative of the business transactions between the plaintiff and defendants, upon which the plaintiff relies for recovery of damages, that a brief, succinct, a clear

connected statement of the incidents and offenses relied on to show a conspiracy, would be no easy task. Whether, on a trial of the facts, the plaintiff could sustain his allegations, we are not called on to, nor could we, express an opinion. By interposing a demurrer the defendants assume that he could prove them, but question their legal sufficiency. At this stage of the proceedings, the guilt or innocence of the defendants, the truth or falsity of the allegations, are not involved.

It appears that in 1927 the defendants Geddes and Preston, chairman and managing director, respectively, of the Rio Tinto Company, visited Baltimore and the plaintiff's home, the result of which was that "a plan was evolved whereby the Davison Chemical Company exchange 90,000 shares of Davison Chemical Company stock for 1000 shares of the defendant the Pyrites Company, Inc. (a wholly owned subsidiary of the Rio Tinto Company), with an agreement on the part of the defendant, the Rio Tinto Company, to purchase concurrently the said Pyrites Company stock at a figure equal to the market price at which the 90,000 shares of Davison Chemical Company stock was then selling on the market, or approximately $35.00 per share, making a total purchase price of $3,150,000." But when the transaction was ready for completion the Davison Chemical Company was notified to put only 35,000 shares in "the name of the Rio Tinto Company and 25,000 shares in the name of a nominee of said Rio Tinto Company, and to relieve the Rio Tinto Company of itself taking the 30,000 shares, and to permit said 30,000 shares to be disposed of to and through New York bankers." The shares rose rapidly on the market to $65 per share, and Geddes, Preston, and Buchanan, the last-named financial director of the Rio Tinto Company, were charged with having made a personal profit of $20 per share out of 20,000 of the 25,000 shares "which they appropriated for themselves instead of for the Rio Tinto Company." It then went on to say that these defendants Geddes, Preston, and Buchanan, through investment trusts in which they were

interested, had purchased so many shares of the Davison Company that, with the 35,000 shares held by the Rio Tinto Company, they held and controlled 100,000 shares of the Davison Company, or twenty per cent. of its stock, an amount equal to that of the plaintiff, so that their position in the Davison Company was equal to his. The plaintiff here complains that "a great deal was being done by * * * Geddes, Buchanan and Preston behind closed doors, and that the cards were not on the table."

To this point we do not find that the defendants Rio Tinto, Geddes, Buchanan, and Preston did anything unlawful. If the plaintiff's financial condition in 1927 was as good as alleged, he did not have to sell, and the defendants Rio Tinto, Geddes, Buchanan, and Preston were not obliged to buy, but, when they did buy, their position in the Davison Company was equal to the plaintiff's, according to a statement in his declaration.

The chief subsidiary of the Davison Company was the Silica Gel Corporation, the story of which appears in *Miller v. Pyrites Co.,* (C. C. A.) 71 Fed. 2nd, 804, in the development of which the plaintiff alleges the Davison Company expended approximately $5,000,000.

The plaintiff charges that in 1928 the defendants Geddes and Buchanan and the Rio Tinto Company suggested that Rio Tinto take over the development of silica gel in Europe and form a foreign company, to which would be allocated one-half of the advances theretofore made to Silica Gel by the Davison Company. It is not necessary to detail the facts regarding this proposal, but the negotiations finally failed, with the result that "nearly $750,000 were thus imposed upon, and unavoidably borne, by the parent Silica Gel corporation." The said "breach of faith upon the part of the said defendants began to shake the confidence of the plaintiff in said defendants' English associates." If the plaintiff suffered any damage personally from this transaction, it was as a stockholder of the Silica Gel Corporation, but that is another kind of case, which will be considered later in this opinion.

The next charge in the declaration is that the defendant Thomas Robbins, described as an agent of the Rio Tinto Company, who was a frequent visitor at the plaintiff's home, "was acting as a spy for and on behalf of the defendants" Geddes, Buchanan, Preston, the Rio Tinto Company, and the Pyrites Company, "with reference to the plaintiff's private interests and affairs and the business concerns" of Davison and Silica Gel, and was transmitting information "relating to said matters to said defendants." There is no charge that he committed any unlawful act or relayed to his principals any false or untrue information. Meanwhile Geddes and his associates were strengthening their position by a "constant accumulation of the shares of stock of the Davison Chemical Company."

A few months previous to the stock market crash of 1929, the plaintiff had on a negotiation for sale of the Davison Company to another large industrial corporation in the United States, and, while it was in progress, a Baltimore broker approached the plaintiff with an offer to buy control of the Davison Company, a purchase which would have involved an outlay in cash of from twenty-five to thirty million dollars. A meeting was later held at the office of Hallgarten & Company, in New York, when the plaintiff said he would have to know the name of the purchaser, suspecting that it came from abroad. The identity of the prospective purchaser was not disclosed, but later the broker advised him that the offer had come from the Rio Tinto company. Nothing came of it, so nobody was hurt; no one benefited. Later, in the fall of 1929, Geddes plied the plaintiff with a number of personal questions for the purpose of ascertaining his stockholdings in the Davison Company and his financial obligations.

In the summer of 1930, the Davison Realty Company, a subsidiary of the Davison Chemical Company, offered to the public, through bankers not named, its notes to the amount of $2,000,000 with an option for 30,000 shares of Davison Chemical stock at $30 per share. *Miller v.*

*Hockley,* (C. C. A.) 80 Fed. 2nd, 980. On the day of the public offering, Geddes and Buchanan arrived in New York, "and became very indignant that said options had been granted the bankers without having been first offered to them. They came to Baltimore and saw the plaintiff at the Davison Chemical Company office." They "returned to New York and went to the banking house of the defendant, The Chase National Bank, and poured out their spleen against the plaintiff to the officers of that institution, where the Davison Chemical Company had banked for quite a number of years." If they thought they had been ill treated by their associate in the Davison Chemical Company, in which they were as heavily interested as he, they may have been indignant and may have given expression to their displeasure, but that would not prove anything unlawful or denote a conspiracy.

Complaint is made of the consolidation of four New York Banks, "shortly after said Robbins returned to London," namely the Chase, Park, and Seaboard Banks and the Equitable Trust Company, into the Chase National Bank. The Davison Company had an open line of credit with the four banks of $5,000,000, of which $2,000,000 was with the Chase Bank. James Bruce, one of the defendants, had been a vice president of the Park Bank, and on the consolidation became a vice president of the Chase Bank. The plaintiff naturally was anxious about the effect the merger of the banks would have on the credit of the Davison Company, but "the defendant Bruce repeatedly assured the plaintiff that he need not worry about the Chase National Bank; that they would take care of him; but he was always evasive as to the amount." In the spring of 1931, Bruce came to Baltimore as president of the Baltimore Trust Company, of which the plaintiff was a large stockholder. He was still told that he "need not worry as the Chase National Bank would take care of all his needs." Bruce did tell the plaintiff, however, that Albert H. Wiggin (president of the Chase Bank) was not friendly to the Davison Chemical Company. In May, 1931, the plaintiff received a

letter from Haddon Howell, a vice president of the Chase Bank, that when the Davison note for $2,000,000 fell due, the following month, payment of the note in full was expected. The bank had a right to demand payment of the debt when due, no matter why. If Bruce had balked or interfered with negotiations for a loan, there might have been some point to the charge; but there is no such condition charged or allegation made here. The plaintiff spoke to Bruce about it, who "made a very evasive answer, but reiterated that the Chase National Bank would take care of the plaintiff, and that he need not worry, and suggested that the plaintiff see Mr. Howell—that he, defendant Bruce, was sure everything would be all right. The plaintiff saw said Howell but found that everything was not all right, and said Howell made the definite statement to the plaintiff that he had not originated the demand for full payment of said note, but it had originated with the defendant Bruce, and had been turned over to him, said Howell, when the defendant Bruce took the position of president of the Baltimore Trust Company. Said Howell made it plain that the defendant, the Chase National Bank, was going to ask the Davison Chemical Company to liquidate its entire indebtedness at that very distressing time. Shortly thereafter the defendant Bruce declared in the presence of several persons that the bankers were going to push the Davison Chemical Company to pay its loans; that the plaintiff had inflated ideas as to the value of the company, and he asked a certain gentleman if he would accept the presidency of the Davison Chemical Company in the place of the plaintiff." Then followed meetings of creditors, to which, in addition, was added, as an alleged conspirator, John Watson, executive head of the International Agricultural Corporation, who "several times insinuated * * * that if he, the plaintiff, were too aggressive in maintaining his position in the controversy with" it, "the plaintiff and his corporation would suffer from the banks." All the plaintiff alleges respecting the International Corporation is that there was a controversy with

the Davison Company "concerning the phosphate rock matter," but what it was or what its connection was with any of the stock or note transactions of the Davison Company is not revealed in this lengthy declaration.

Shortly after this demand for payment of the Chase loan, at the plaintiff's suggestion, a meeting of creditors to whom the Davison Company was indebted was called, "which appeared to be friendly," ending with a request that the plaintiff have J. O. McKinzey & Company of Chicago make a survey of the Davison Company. The report was favorable and recommended a continuance of the Davison Company's loans.

While the meeting just referred to was being held, another was assembled elsewhere in New York "to settle the dispute concerning the phosphate rock matter," between the International Agricultural Corporation, of which the defendant John Watson was the executive head. As said, what the controversy was or its connection with the alleged conspiracy, the declaration does not disclose, but the only apparent reason for making Watson a defendant is that he was too familiar with the attitude of Davison's banking creditors. If he did anything unlawful, the declaration does not disclose it.

Following the McKinzey report, another meeting of creditor banks was held at which Robbins was present, claiming to represent the Rothschilds of London, and that they were creditors of the Davison Company in the amount of $500,000, a statement denied by the plaintiff. Robbins there told the plaintiff that he was instructed from London to see that the plaintiff was eliminated from the Davison Company and added that "it would be for the company's interest." Soon afterwards the plaintiff was notified that the banks wanted a representative in the company with the title of executive vice-president, and a number of their nominees installed as directors. The plaintiff was notified by three of the bankers, including the defendant Bruce, that they had decided upon Henry E. Treide as vice president, and had prepared a resolution to be passed at the annual meeting giving

him "full powers." He was elected, and for some months co-operated with the plaintiff, "and a great portion of the indebtedness was liquidated. Then, early in 1932, the defendant Geddes came over from London and met the defendant Treide in New York. From and ever after said conference between said two defendants, Geddes and Treide, the attitude of the defendant toward the plaintiff changed openly and entirely," and he was thereafter excluded from the direction and management of the company. In thus restricting the authority of the plaintiff there is no allegation that it was done without proper or lawful corporate action.

One of the complaints is that Geddes recommended the divorce of Silica Gel from Davison "in order that Silica Gel Company might be choked out of existence." Arrangements were made for temporary financing. It was not long, however, before the inevitable happened and a reorganization was sought for the Davison Chemical Company, under section 77B of the Bankruptcy Act, 11 U. S. Code Ann., sec. 207, and a receivership had for the Silica Gel Corporation with a view to its liquidation. In both proceedings the Pyrites Company was the petitioner. The plaintiff in his declaration questions the validity of these proceedings, but the right of the petitioners to receiverships was decreed in a court which had jurisdiction. *In re Reorganization of Davison Chemical Co.* Daily Record, October 21st, 1935; *Miller v. Pyrites Co.*, 4 Cir., 71 F. 2d 804; *Duffy v. Treide*, 4 Cir., 75 F. 2d 17. And its decrees cannot be collaterally attacked. *Owens v. Graetzel* 149 Md. 689, 695, 132 A. 265, 267; *Jersey Boulevard Corp. v. Lerner Stores Corp.*, 168 Md. 532, 541, 178 A. 707, 710, 711.

All we gather from the charge against G. Ridgely Sappington is that he acted as counsel for the Davison Company. There is no charge from which it can be inferred that he did anything unprofessional or perpetrated a fraud on any one.

The test of a conspiracy in this state is whether the acts complained of are unlawful and the plaintiff, as

the result of such unlawful acts, has been damaged; but it is not actionable if the damage comes from a lawful act or series of lawful acts of the conspirators. In the leading case in this court on civil conspiracy, *Kimball v. Harman,* 34 Md. 407, 409, it is said: "There is no doubt of the right of a plaintiff to maintain an action on the case against several, for conspiring to do, *and actually doing,* some unlawful act to his damage. But it is equally well-established, that no such action can be maintained unless the plaintiff can show that he has in fact been aggrieved, or has sustained actual legal damage by some overt act, done in pursuance and execution of the conspiracy," and "an act which, if done by one alone, constitutes no ground of an action on the case, cannot be made the ground of such action by alleging it to have been done by and through a conspiracy of several. The quality of the act, and the nature of the injury inflicted by it, must determine the question whether the action will lie. * * * The fact of conspiracy is matter of aggravation." The principle of *Kimball v. Harman, supra,* has been consistently followed in this state. *Robertson v. Parks,* 76 Md. 118, 135, 24 A. 411, 413, 414; *Sumwalt Ice & Coal Co. v. Knickerbocker* 114 Md. 403, 414, 80 A. 48, 50; *Debnam v. Simonson,* 124 Md. 354, 92 A. 782; *Ragan v. Susquehanna Power Co.,* 157 Md. 521, 525, 146 A. 758, 759; *Rent-A-Car Co. v. Rutgers Fire Ins. Co.,* 161 Md. 249, 260, 156 A. 847, 852. See, also, 11 *Amer. Jurisprudence,* 577, 578.

The plaintiff contends, on the authority of *Klingel's Pharmacy v. Sharp & Dohme,* 104 Md. 218, 64 A. 1029, that his right to maintain his suit is established. In that case the plaintiff charged the defendant with conspiring to blacklist him as a purchaser of drugs for his refusal to maintain a fixed schedule of prices, which was alleged to be the result of an agreement in restraint of trade, an agreement which is unlawful, and in this respect this court distinguished it (page 231, 64 A. page 1030) from *Kimball v. Harman, supra.*

The plaintiff, in support of his position, quotes and dis-

cusses at some length from the opinion in *Willett v. Herrick*, 242 Mass. 471, 136 N. E. 366, which went up on an order sustaining a demurrer to the declaration. The rule in the Massachusetts court differs from ours. There, the conspiracy is the offense, and acts done in pursuance of a conspiracy are actionable, though no action would lie if the acts were done separately by the individual conspirators. The effect gives the right of action, rather than the cause. Here (*Kimball v. Harman, supra*) there is no right of action if the acts done by the conspirators are not unlawful, "the fact of conspiracy is matter of aggravation." In this state it makes no difference what the conspirators' motives may be, if their acts are not unlawful. When the Massachusetts case, *Willett v. Herrick*, 258 Mass. 585, 155 N. E. 589, went up on appeal by the defendants, the court found the evidence did not support the facts alleged in the declaration.

The plaintiff has not alleged any acts charged to these defendants leading up to the failures of the Davison Chemical Company, the Silica Gel Corporation, and other associated corporations, which are unlawful. What they did may have contributed to the failures, but we do not find that any of them were not acting within their rights. The effect of all that the plaintiff relates in his declaration may have been as disastrous as he says, but, if so, his wrongs, if any, are those of a stockholder, which can only be enforced through a receiver, or, if he refuses to act, then by a stockholder for the benefit of all. *France on Corporations* (2nd Ed.) 107; *Smith v. Hurd*, 12 Metc., (Mass.) 371; *Green v. Victor Talking Machine Co.*, (C. C. A.) 24 Fed. 2nd 378; *Gerli v. Silk Assn. of America* (D. C.) 36 Fed. 2nd 959; *Seitz v. Michel*, 148 Minn. 80, 181 N. W. 102.

*Judgment affirmed, with costs.*

PARKE and JOHNSON, JJ., agree with the conclusion.