639 A.2d 112

Clifford MACKLIN et al.

v.

ROBERT LOGAN ASSOCIATES.

No. 116, September Term, 1992.

Court of Appeals of Maryland.

March 25, 1994.

Reconsideration Denied and Opinion Corrected May 6, 1994.

288

Kenneth L. Crosson, on brief, Fairfax, VA, for appellant.

Henry F. Leonnig, on brief, Upper Marlboro, for appellee.

Argued before ELDRIDGE, RODOWSKY, McAULIFFE,* CHASANOW, KARWACKI, ROBERT M. BELL and CHARLES E. ORTH, Jr., Judge of the Court of Appeals (Retired, Specially Assigned), JJ.

ROBERT M. BELL, Judge.

■ Robert Logan Associates, the appellee, filed suit in the Circuit Court for Prince George's County against Clifford and Sandra Macklin,[1] the appellants, alleging unlawful appropriation of its trade name, "Golden Cue," and tortious interference with its lease. After a jury trial, verdicts were entered in favor of the appellee as follows: for unlawful appropriation of trade name, compensatory damages of $300 and punitive damages of $50,000 and for tortious interference with the appellee's lease, $100,000 compensatory damages and $75,000 punitive damages. Their motion for new trial, to revise judgment and for judgment notwithstanding the verdict having been denied, appellants noted a timely appeal to the Court of Special Appeals. Before that court considered the matter, we granted certiorari, 329 Md. 22, 616 A.2d 1286, on our own motion, to address two issues: (1) whether the appellants

---

* McAuliffe, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

1. Although not named in the initial complaint, the appellee amended its complaint to include Sandra J. Macklin as a defendant. The appellee also sued Golden Cue, Inc., a corporation formed by the appellants to conduct their billiards room business. The latter defendant, however, is not involved in the appeal of the tortious interference with contract issue, its motion for judgment made at the end of the appellee's case having been granted as to that count. The appellee also sought to enjoin the appellants from using the trade name, "Golden Cue." It was granted an interlocutory injunction following a contested hearing. Thereafter, the appellants stipulated to the entry of a permanent injunction.

tortiously interfered with the appellee's lease [2] by negotiating

2. The appellee contends that the appellants did not argue, in their motion for judgment made at the conclusion of the evidence, "that an improper purpose or motive is not adequate to support the tort of wrongful interference but that there must be illegal means used where the contract is one that is terminable at will and the tortfeasor is a competitor." Appellee's brief at 15. Thus, because Maryland Rule 2–519(a) requires that the grounds for a motion for judgment be set forth with particularity, *see Graham v. State*, 325 Md. 398, 417, 601 A.2d 131, 140 (1992) (discussing Maryland Rule 4–324(a), the criminal counterpart to Maryland Rule 2–519(a)); *Warfield v. State*, 315 Md. 474, 484, 554 A.2d 1238, 1243–44 (1989); *Rockville Corp. v. Rogan*, 246 Md. 482, 229 A.2d 76 (1967); *State v. Lyles*, 308 Md. 129, 135, 517 A.2d 761, 764–65 (1986); *Laubach v. Franklin Square Hosp.*, 79 Md.App. 203, 208, 556 A.2d 682, 685 (1989), *aff'd*, 318 Md. 615, 569 A.2d 693 (1990); *Ford v. Tittsworth*, 77 Md.App. 770, 773, 551 A.2d 945, 946 (1989), that issue has not been preserved and, therefore, is not before this Court. In further support of that contention, the appellee asserts that the appellants did not except to an instruction, *i.e.*

> if you find that the defendants in leasing the premises occupied by the plaintiff had one of their purposes, had as one of their purposes the appropriation of the trade name, Golden Cue, they would have wrongfully interfered with plaintiff's business relationship provided, of course, you are satisfied that the other three elements of the tort of wrongful interference have been established by a preponderance of the evidence,

which the appellants contend confused the jury concerning the elements of the tort. We do not agree. The trial court instructed the jury on tortious interference as follows:

> The first is malice, that is, the defendants acted with a wrongful or illegal purpose or utilized wrongful or illegal means in interfering with the plaintiff's business relationship calculated to cause harm to the plaintiff in its lawful business; the second element, that they acted without justification; the third element, that there was in existence such a business relationship; and the fourth element that the defendants knew of this business relationship.

At the conclusion of the evidence, the appellants argued:

> Your Honor, first of all, looking at the elements of tortious interference as listed in the jury instructions, we still have trouble with 2 and 3 as well as 4. The second element, that they had knowledge of the lease without intentional—intentional acts without justification induced the third party to render performance of the contract impossible, we don't think there is evidence of that, and GLM's breach or the action making it impossible indicated the plaintiff suffered damages. We don't think there are elements of that either.

Although certainly not the clearest imaginable statement of objection, the appellants did focus the court's attention on ʳelements two and three; thus, they indicated their concern that the proof was insufficient as to those two elements. And it is those two elements to which the appellants' argument in this Court is addressed.

with the appellee's landlord for the lease of premises occupied by the appellee prior to termination of appellee's lease and, (2) whether the trial court erred in sustaining the jury's punitive damages awards.

## I.

The appellee owned and operated a billiard room business, in leased premises, located in the Bladensburg Shopping Center in Bladensburg, Maryland, but serving a wide area, including northern Virginia, Clinton, Waldorf, Silver Spring, College Park, Beltsville, Greenbelt, and Laurel. The business was operated under the trade name, "Golden Cue." The business had been in operation for some time prior to the events precipitating this case and, during that time, received favorable media publicity as a family billiard center.

The appellee's lease was renegotiated in February, 1985. Its new lease, which was for a term of five years, contemplated the possibility that the shopping center would be sold. The lease provided that either party could terminate the lease by giving 90 days notice, but only after three years of the lease term had passed. It also provided that if the lease were terminated by the landlord, the landlord must, in addition, pay the appellee $5,000.[3] The rental payments due under the

Nor is there any more merit to the appellee's complaint that the appellants did not object to the instruction they claimed to be confusing. That instruction, which the court gave, was the appellee's proposed instruction No. 19. Objecting to the court's giving of that instruction, the appellants said:

[I]t is ... emphasizing different elements of this tort. He says that this is one element if you do this, and as long as you do the other three things, you got tort—over my objection you have already indicated that you are going give No. 12, and I assume that the court is going to give the elements of it. Nineteen ... [is] just taking one or two elements of that out.

Again, while not as artfully phrased as it might have been, we think it sufficient to preserve the issue. This is particularly so since the court adamantly insisted on giving it.

**3.** The addendum to paragraph two of the lease agreement, provided:

In the event of a sale of the premises or an anticipated sale of the premises, the Landlord or Tenant may, at their respective option,

lease ranged from a low of $1,200 per month at its inception to a high of $1,500 a month at the end of the term.

The shopping center was sold to GLM, the landlord, in July, 1986. Following unsuccessful attempts to renegotiate the terms of the appellee's lease, GLM exercised its option to terminate the lease by letter dated May 16, 1989, giving the appellee 90 days to vacate the premises. Upon receipt of the cancellation notice, the appellee immediately contacted GLM for the purpose of renegotiating the lease. GLM refused to do so and advised the appellee, *albeit* without identifying to whom, that the premises had been leased to a new tenant.

GLM subsequently leased a portion of the premises formerly leased by the appellee to the appellants for a term of five years, commencing thirty days after May 26, 1989, when GLM delivered the lease to Clifford Macklin. Although covering the same use, *i.e.,* "billiard lounge and retail billiard supply sales as presently operated," [4] appellants' lease was more favorable to GLM than the appellee's had been. Rather than a maximum monthly rental of $1,500, the appellants agreed to pay fixed annual minimum rents ranging from $2,404.79 in the first year to $3,253.54 in the fifth year, with an increase each year. In addition, the appellants agreed to pay as additional

---

cancel this Lease Agreement at any time after the end of the third year by giving ninety (90) days notice of intention to cancel; such notice to be given to the Tenant in writing, by certified mail addressed to the demised premises or, in the case of the Landlord, to the address shown on page 1 of this lease or such other place as Landlord shall specify in writing to Tenant.

In the event that the Landlord exercises its option to cancel this Lease Agreement as hereinbefore described, it shall pay to the Tenant the sum of Five Thousand and no/100 dollars ($5,000.00).

In the event that notice to cancel is not given as hereinabove described then the terms of this Lease Agreement shall be as described in Paragraph 2 of the lease form.

4. The appellants' lease, unlike the appellee's, also permitted "a snack bar serving soft drinks, pre-made sandwiches and snacks ... [to] be located behind the cashier's desk. Such snack bar shall be used principally by the patrons of the billiard parlor. No signs indicating such consumption goods shall be placed in the windows or the outside exterior of the store."

rent, $12,500, "due upon commencement of the lease, to cover cost related to the conversion of the existing space of 5157 square feet of two stores in order to conform to tenants' needs." Among the conversion costs was the $5,000 payment due the appellee upon the landlord's cancellation of the lease. The appellants executed the lease on May 26, 1989; however, negotiation of the terms of the lease occurred prior to that date.[5]

Before they executed the lease, the appellants investigated the feasibility of obtaining a use and occupancy permit. Because the use and occupancy permit applicable to the appellee's premises had been issued in the name of "The Golden Cue" as a result of a grandfathered special exception, they learned that it would have required extensive and complex legal proceedings to obtain one in any other name. Consequently, the appellants effected a transfer of the use and occupancy permit by using the name, "Golden Cue." Subsequently, having discovered that the appellee had neither formally registered "The Golden Cue" as a trade name nor formed a corporation under that name, the appellants incorporated as Golden Cue, Inc. So armed, the appellants sought to obtain the exclusive use of the telephone number listed for

---

5. The parties dispute when, and by whom, the negotiations for the appellee's space were initiated. The appellants maintain that they were contacted by GLM as a part of its marketing effort, having obtained Clifford Macklin's name when he called their offices to inquire about extending the time for removal of billiard tables that were being kept in space GLM allowed the appellee to use for storage.

The appellee presented an entirely different picture. It maintained that the initial contact was made by the appellants when, as early as February 1, 1989, they expressed an interest in leasing space in a shopping center near their home, i.e., the Bladensburg Shopping Center. The appellee asserts that, at that time, the appellants had a telephone conversation with the executive vice president of GLM regarding their ability to be a tenant in that shopping center. That conversation was followed up, as early as March, 1989, by the submission of financial statements. Along with the financial statements, the appellee says, the appellants submitted a proposal to operate a "family billiard center" in the premises occupied by appellee, under the name "The Rack & Cue" or the "The Golden Cue." By May, then, according to the appellee, the negotiations had already proceeded apace.

The Golden Cue.[6] Also in the fall of 1989, the appellants wrote to the appellee informing it that the appellants had formed a corporation under that name and complaining of the appellee's use of "its" trade name.

Prior to the termination of the appellee's lease, Clifford Macklin, who, at one time, sold cues to the appellee for resale, was permitted by Logan Sharp, the appellee's operator, to store equipment in premises the appellee leased on a month-to-month basis for storage. Logan Sharp testified that Clifford Macklin had expressed an interest in purchasing the appellee's business in 1989. The matter was dropped when Clifford Macklin was informed that the purchase price would be between $150,000 and $175,000. The appellee also presented testimony that Clifford Macklin had stated on several occasions that "he was going to take the business from Logan ... [because] Logan was fooling around with him in business dealings."

Having to vacate the premises, the appellee advertised its billiard tables for sale. The appellants responded to the advertisement and offered to purchase not only the billiard tables, but all of the appellee's billiard equipment for $20,000. Believing that price to be too low, the appellee declined the offer.

## II.

The tort of intentional interference with contract is well established in Maryland. *Travelers Indemnity v. Mer-*

---

**6.** Logan Sharp, who operated the appellee, and his new partner organized a corporation known as Logan's Sharpshooters Billiards, Inc., and opened a billiard establishment under that name in Waldorf, Maryland. Logan and his mother, Martha Sharp, who owned the appellee, maintained the Golden Cue's telephone number and listing in the yellow pages, even though the trade name Golden Cue was not utilized in the new business; the appellee retained the number and listing as a referral source for its new establishment. As a result, calls made to the Golden Cue were forwarded to the Waldorf telephone number. Thus, there were two telephone numbers for the Golden Cue. When a person called information for the number, the telephone company gave out either the appellee's number, the appellants's number, or both.

*ling,* 326 Md. 329, 605 A.2d 83 (1992); *K & K Management v. Lee,* 316 Md. 137, 557 A.2d 965 (1989); *Sharrow v. State Farm Mutual,* 306 Md. 754, 511 A.2d 492 (1986); *Vane v. Nocella,* 303 Md. 362, 494 A.2d 181 (1985); *Natural Design, Inc. v. Rouse Company,* 302 Md. 47, 485 A.2d 663 (1984); *Rite Aid Corp. v. Lake Shore, Inc.,* 298 Md. 611, 471 A.2d 735 (1984); *Wilmington Trust Company v. Clark,* 289 Md. 313, 424 A.2d 744 (1981); *Cunningham v. A.S. Abell Co.,* 264 Md. 649, 288 A.2d 157, *cert. denied,* 409 U.S. 865, 93 S.Ct. 160, 34 L.Ed.2d 114 (1972); *Stannard v. McCool,* 198 Md. 609, 84 A.2d 862 (1951); *Miller v. Preston,* 174 Md. 302, 199 A. 471 (1938); *Green v. Samuelson,* 168 Md. 421, 178 A. 109 (1935); *Pocketbook Workers v. Orlove,* 158 Md. 496, 148 A. 826 (1930); *Goldman v. Harford Road Building Association,* 150 Md. 677, 133 A. 843 (1926); *McCarter v. Chamber of Commerce,* 126 Md. 131, 94 A. 541 (1915); *Cumberland Glass Manufacturing Company v. DeWitt,* 120 Md. 381, 87 A. 927 (1913), *aff'd,* 237 U.S. 447, 35 S.Ct. 636, 59 L.Ed. 1042 (1915); *Sumwalt Ice and Coal Company v. Knickerbocker Ice Company,* 114 Md. 403, 80 A. 48 (1911); *Willner v. Silverman,* 109 Md. 341, 71 A. 962 (1909); *Knickerbocker Ice Company v. Gardiner Dairy Company,* 107 Md. 556, 69 A. 405 (1908); *Klingel's Pharmacy v. Sharp & Dohme,* 104 Md. 218, 64 A. 1029 (1906); *Gore v. Condon,* 87 Md. 368, 39 A. 1042 (1898); *Lucke v. Clothing Cutters' & Trimmers' Assembly,* 77 Md. 396, 26 A. 505 (1893). The tort, which has two general manifestations, *Natural Design, Inc.,* 302 Md. at 69, 485 A.2d at 674, is committed when a third party's intentional interference with another in his or her business or occupation induces a breach of an existing contract or, absent an existing contract, maliciously or wrongfully infringes upon an economic relationship. *Sharrow,* 306 Md. at 763, 511 A.2d at 497; *Natural Design, Inc.,* 302 Md. at 69, 485 A.2d at 674. *See* Restatement (Second) of Torts § 766.[7]

---

7. The Restatement (Second) of Torts § 766 provides:

 A. One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by preventing the other from performing the contract or causing his performance to be more expensive or burden-

While the two manifestations of the tort share an underlying rationale, *i.e.*, "under certain circumstances, a party is liable if he interferes with and damages another in his business or occupation," they differ in their tolerance of interference. As we said in *Natural Design, Inc.*: "[W]here a contract between two parties exists, the circumstances in which a third party has a right to interfere with the performance of that contract are more narrowly restricted. A broader right to interfere with economic relations exists where no contract or a contract terminable at will is involved." *Id.* at 69–70, 485 A.2d at 674.

Count two of the amended complaint alleges that the appellants,

> well knowing of the Plaintiff's lease, ... did approach The GLM Companies, the manager for the Landlord, and maliciously and with the intent to injure the Plaintiff did induce the said Landlord to breach and/or cancel the lease with the Plaintiff notwithstanding that said lease had until February 29, 1990 to run and could be renewed fully intending to appropriate the Plaintiff's trade name, business and goodwill thereby causing the Plaintiff the loss of his business and profits earned and to be earned.

■ Although it recognizes that the effect of cancellation of the lease would be to cause the appellee prospective loss, the primary focus of this allegation is on the appellants' inducement of the landlord to cancel the lease, perhaps because of the appellee's recognition that, until the option to cancel is exercised, a lease terminable at will is an existing contract. It views this case as involving the breach of an existing contract.

---

some, is subject to liability to the other for the pecuniary loss resulting to him.

B. One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from the loss of the benefits of the relation, whether the interference consists of

(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or

(b) preventing the other from acquiring or continuing the prospective relation.

Indeed, that is the way the appellee argued the case, both in brief and at oral argument. Notwithstanding that a lease terminable at will is an existing contract until it is cancelled, neither party to it has a vested interest in its continuation—it may or may not continue at the sole option of one of the parties. Thus, as *Natural Design* recognizes, a contract terminable at will is more closely akin to the situation where no contract exists. 302 Md. at 69–70; 485 A.2d at 674. And because the effect of the exercise of the option to cancel is interference with prospective economic relationships, it is that branch of the tort that is implicated when the termination of such a contract is induced. *Id. See* Restatement (Second) of Torts § 768(1).

The appellee having alleged that the appellants maliciously interfered with its lease by initiating negotiations with GLM and accepting a lease for the space the appellee occupied, at terms more favorable to GLM, before the appellee's lease terminated, the jury found that the appellants induced GLM to cancel the existing lease agreement with the appellee.

The appellants mount a two-pronged attack on the jury's verdict. First, they assert that, taken in the light most favorable to the appellee, the evidence was legally insufficient. In that regard, the appellants maintain that their conduct subsequent to the cancellation of the appellee's lease is irrelevant on the issue of whether they tortiously interfered with that lease. Moreover, they continue, the appellee's heavy reliance on the fact that the appellants leased the premises it once occupied, and used them for the same purpose, as well as its reliance on the appellants' use and efforts to continue to use the appellee's trade name inappropriately focus on the consequences of the cancellation of the lease rather than its cause. They find particularly revealing, the concession made by the appellee's trial counsel: "[I]f they went in there and operated a bakery I don't think we'd be here today." The appellants observe, "if the defendants tortiously interfered with plaintiff's lease but opened a bakery, defendants would still be liable for the tortious interference." Appellants' brief at 13.

Noting the requirement that the interference must have been wrongful or unlawful, *Merling,* 326 Md. at 343, 605 A.2d at 90; *Sharrow,* 306 Md. at 765, 511 A.2d at 498; *Natural Design, Inc.,* 302 Md. at 71–74, 485 A.2d at 675; *Stannard,* 198 Md. at 616, 84 A.2d at 866, and the types of unlawful means identified in *Lee,* 316 Md. at 155–170, 557 A.2d at 973–81, *i.e.,* "violence, intimidation, defamation, injurious falsehood or other fraud, violation of criminal law and the institution or threat of groundless civil suits or criminal prosecution in bad faith," none of which, they point out, is applicable to the case *sub judice,* the appellants assert that "there was no testimony of any such conduct in this case and the evidence presented by the plaintiff was totally devoid of any reference to the defendants' attempting to influence GLM in its decision to terminate the lease of the plaintiff." Appellants' brief at 10. They contend, rather, that their negotiating with GLM and ultimately entering into a lease agreement with it for the operation of a billiard room business like the one conducted by appellee constituted legitimate competition for the space the appellee once occupied.[8] As they see it, because the lease contained a provision giving each party the right to terminate the lease upon 90 days notice, after the expiration of the third year, it was a lease that was terminable at will. Accordingly, the appellants argue that they were entitled to greater leeway in interfering with such contract than had it not contained such a provision. In any event, they assert, irrespective of their intention as to the contractual relationship between GLM and the appellee, in point of fact, because it was legitimate competition, although it may have affected the appellee's contractual relationship, their conduct simply was not improper.

8. As a matter of fact, the appellants deny that they initiated discussions with GLM concerning the appellee's space. Indeed, they maintain that it was the landlord, who apparently determined that the space was marketable, negotiations with the appellee having been unsuccessful, who contacted them. In other words, the appellants assert that they did not induce GLM to terminate the appellee's lease, but GLM decided on its own to exercise the right to cancel reserved to it by its predecessor.

■■■ To establish tortious interference with prospective contractual relations, it is necessary to prove both a tortious intent and improper or wrongful conduct. *Lee*, 316 Md. at 155–170, 557 A.2d at 973–981; *Sharrow*, 306 Md. at 765, 511 A.2d at 498; *Natural Design, Inc.*, 302 Md. at 71–74, 485 A.2d at 675; Restatement (Second) of Torts § 766B. *See Merling*, 326 Md. at 343, 605 A.2d at 90 ("for one to recover for tortious interference with contractual or economic relations, the interference must have been wrongful or unlawful."). A plaintiff may prove tortious intent by showing that the defendant intentionally induced the breach or termination of the contract in order to harm the plaintiff or to benefit the defendant at the expense of the plaintiff. What is improper or wrongful conduct is incapable of precise definition, *see Lee*, 316 Md. at 155–70, 557 A.2d at 973–81; *Sharrow*, 306 A.2d at 765, 511 A.2d at 498; *Natural Design, Inc.*, 302 Md. at 71–74, 485 A.2d at 675; ordinarily whether particular conduct is proper or improper is a factual question to be determined on the basis of all the facts and circumstances. *Natural Design*, 302 Md. at 71, 485 A.2d at 675. While a plaintiff may prove that a defendant acted improperly or wrongfully by showing that he or she used violence, intimidation, injurious falsehood or other fraud, violated the criminal law, and instituted, or threatened, groundless civil suits or criminal prosecutions in bad faith, *Merling*, 326 Md. at 343, 605 A.2d at 90; *Lee*, 316 Md. at 155–70, 557 A.2d at 973–81; *Sharrow*, 306 A.2d at 765, 511 A.2d at 498; *Natural Design, Inc.*, 302 Md. at 71–74, 485 A.2d at 675; *Stannard*, 158 Md. at 616, 84 A.2d at 866; *Gardiner Dairy Company*, 107 Md. 556, 69 A. 405; *Lucke*, 77 Md. 396, 26 A. 505, in fact, conduct that is quite subtle, nevertheless, can be improper or wrongful. It is clear that, to be improper or wrongful, conduct need not be as overt as that in *Gardiner Dairy Company*, 107 Md. 556, 69 A. 405 (defendant threatening to breach an existing contract with the plaintiff if plaintiff did not terminate its contract with third party) and *Lucke*, 77 Md. 396, 26 A. 505 (defendant caused employer to discharge employee by threatening to notify unions that employer was a non-union shop). In any event, to be actionable, the improper

or wrongful conduct must induce the breach or termination of the contract. *Sharrow,* 306 Md. at 765, 511 A.2d at 498.

Simply because a person induces another to exercise an existing right to terminate a contract, even if that person's intention with regard to one of the parties to the contract is tortious, does not make it actionable. That is, his or her conduct is not thereby rendered improper or wrongful as a matter of law. *Sharrow,* 306 Md. at 765, 511 A.2d at 498. No matter with what intention a person may have acted, his or her conduct is not improper or wrongful if he or she had the right to cause the termination. *Id.* at 764, 511 A.2d at 498.

One recognized "just cause for damaging another in his [or her] business is competition." *Natural Design, Inc.,* 302 Md. at 72, 485 A.2d at 676. *See Gardiner Dairy Company,* 107 Md. at 566, 69 A. at 409 ("lawful competition must be sustained and encouraged by law"). Thus, interference with another's contract or business relations in the name of competition is improper only if the means used are, in themselves, improper. *See Goldman,* 150 Md. at 684, 133 A. at 846, in which we said:

> "Iron sharpeneth iron" is ancient wisdom, and the law is in accord in favoring free competition, since ordinarily it is essential to the general welfare of society, notwithstanding competition is not altruistic but is fundamentally the play of interest against interest, and so involves the interference of the successful competitor in the matter of their common rivalry. Competition is the state in which men live and is not a tort, unless the nature of the method employed is not justified by public policy, and so supplies the condition to constitute a legal wrong.

*See Natural Design, Inc.,* 302 Md. at 72–73, 485 A.2d at 676. *See also* Restatement (Second) of Torts § 768 ("Competition as Proper or Improper Interference"). Subsection (1) of that section provides:

> (1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract ter-

minable at will does not interfere improperly with the other's relation, if

(a) the relation concerns a matter involved in the competition between the actor and the other and

(b) the actor does not employ wrongful means and

(c) his action does not create or continue an unlawful restraint of trade and

(d) his purpose is at least in part to advance his interest in competing with the other.

 When the existing contract is not terminable at will, inducing its breach, even for competitive purposes, is itself improper and, consequently, not "just cause" for damaging another in his or her business. *DeWitt,* 120 Md. at 394–95, 87 A. at 932; *Gardiner Dairy Company,* 107 Md. at 564–65, 69 A. at 408; *Gore v. Condon,* 87 Md. 368, 39 A. 1042 (1898); *Walker v. Cronin,* 107 Mass. 555 (1871). As *Gardiner Dairy Company,* 107 Md. at 564, 69 A. at 408, noted:

It cannot be denied that it is unlawful for a party to a contract to break it, unless, of course, he has sufficient ground for doing so, and therefore when a third party procures or induces him to do so, he is causing him to do an unlawful act, which is itself unlawful, and the law ought to afford a remedy to the injured party.

This is true even though the defendant purports to act in the interest of legitimate competition. *DeWitt,* 120 Md. at 395, 87 A. at 932; *Gardiner Dairy Company,* 107 Md. at 566, 69 A. at 409. The rationale for this rule is set forth in *Walker v. Cronin,* 107 Mass. 555, 564 (1871):

Everyone has a right to enjoy the fruits and advantages of his own enterprise, industry, skill and credit. He has no right to be protected against competition; but he has a right to be free from malicious and wanton interference, disturbance or annoyance. If disturbance or loss, as a result of competition or the exercise of like rights by others, it is

*damnum absque injuria,* unless some superior right by contract or otherwise is interfered with.

*See* Restatement (Second) of Torts § 768(2), which provides:
The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will.

Thus, where there is an existing contract, not terminable at will, between a plaintiff and a third party, acts by a defendant to induce the third party to breach that contract are, themselves, improper and wrongful. It follows, therefore, that "[p]rocuring a breach of contract is an actionable wrong unless there be justification for interfering with the legal right." *Gardiner Dairy Company,* 107 Md. at 566, 69 A. at 409, quoting *South Wales Miners Federation v. Glamoyan Coal Company,* A.C. 239 (1905).

The situation is entirely different when the existing contract is one terminable at will or at the option of the party importuned. Where the contract is one terminable at will by the party who refuses to continue performance, there is a broader right to interfere, *Natural Design,* 302 Md. at 69–70, 485 A.2d at 674. *See Harris v. Hirschfeld,* 13 Cal.App.2d 204, 56 P.2d 1252, 1253 (1936) (no cause of action lies against a third person who induces another to terminate a partnership at will), because competition in that case may, indeed, provide legitimate justification for the inducement. *Cf.* Restatement (Second) of Torts § 768. Where the decision whether to terminate or continue a contract with the plaintiff rests solely in the discretion of the third party, it is not improper or wrongful conduct for one in competition with the plaintiff to provide that third party with a reason for exercising his or her discretion. *See Mac Enterprises, Inc. v. Del E. Webb Development Co.,* 132 Ariz. 331, 645 P.2d 1245, 1250 (Ariz.App.1982) (no tortious interference where landlord had right to cancel its lease with tenant). No matter with what motive or intention a defendant may have acted, it cannot be said in that situation, that he or she acted improperly or wrongfully so long as he or

she was legitimately competing for the subject of the contract. *Memorial Gardens, Inc. v. Olympian Sales & Management Consultants, Inc.,* 690 P.2d 207, 211 (Colo.1984); *Mulei v. Jet Courier Service, Inc.,* 739 P.2d 889 (Colo.App.1987), *rev'd in part and aff'd in part,* 771 P.2d 486 (Colo. (1989) (competitor who intentionally causes third person not to continue an existing contract terminable at will does not improperly interfere with contractual relations if no wrongful means are employed). *But see La Rocco v. Bakwin,* 108 Ill.App.3d 723, 64 Ill.Dec. 286, 292, 439 N.E.2d 537, 543 (1982) (cause of action for intentional interference with business relationship exists where defendant interfered with relationship between attorney and client, even though relationship is terminable at will).

■ Although an action in tort lies for intentional interference with contractual relations, if the contract is terminable at will, there is no legal assurance of future performance; thus a competitor who intentionally causes a third person not to continue an existing contract terminable at will does not improperly interfere with the contractual relation if no wrongful means are employed. *Mulei,* 739 P.2d at 893; *Harris v. Hirschfeld,* 56 P.2d at 1253. Indeed, it is even questionable whether, in that circumstance, the defendant can even be said to have induced the termination of the contract; it is expected that one with the option to do so, will terminate a contract when presented with good reasons for doing so. *See Cunningham,* 264 Md. at 658, 288 A.2d at 162. Presenting a party with the right to terminate a contract at its sole option with a reason for doing so is very close to the scenario which we held in *Gardiner Dairy Company* was not an example of "unlawful means":

> ... [A] party may be the means of causing the contract to be broken, and still not be liable. To illustrate, A may advertise his goods for sale at such a low rate as to result in a breach of contract by B, who was under contract with C, to buy at a higher price, but that would not make A liable to C, or to make the illustration more apt, if the Knickerbocker Company had simply refused to furnish the Sumwalt Company with ice the Gardiner Company would not for that

reason alone have a remedy against the Knickerbocker Company. Such action would not necessarily be unlawful or wrongful, but if the Knickerbocker Company refused to furnish the Sumwalt Company so that it could furnish the Gardiner Company, although it knew it was under contract to do so, in order to get the business of the Gardiner Company for itself on its own terms, then it was unlawful to thus interfere with the contract between the Sumwalt Company and the Gardiner Company.

107 Md. at 567–68, 69 A. at 409. In other words, in addition to providing the third party with a basis for exercising its discretion to terminate the contract, where the contract is one that is terminable at will, it must also be shown that the defendant otherwise acted improperly or wrongfully.

The appellee argues that, although, to get to the jury, it only had to produce sufficient evidence that the appellants acted with a tortious intent, it nevertheless produced sufficient evidence of the appellants' improper or wrongful conduct as well. In that regard, the appellee points to the evidence of Clifford Macklin's stated intention to take the appellee's business; the appellants' approaching GLM about acquiring the appellee's location to operate the same kind of business, which, "in all probability would utilize the appellee's trade name," *see* Appellee's brief at 16–17; the appellants' agreeing to pay the $5,000.00 GLM was required to pay upon exercising its right to terminate the lease; the appellants' transactions with Prince George's County officials, resulting in transfer of the appellee's use and occupancy permit to the appellants; the appellants' attempt to obtain from the appellee, by misrepresentation and at a depressed price, appellee's billiard tables and equipment; and the appellants' use of the appellee's trade name. Contrary to the appellants' position, the appellee maintains that misappropriation of the appellee's trade name, although a separate tort, may be the basis for a finding of tortious interference with the appellee's lease.

The evidence upon which the appellee relies does tend to prove the appellants' tortious motive or intent. From that

evidence, the jury could, as it probably did, infer that the appellants intended to take the appellee's business and to appropriate its trade name. We do not agree that the same evidence tended to prove that the appellants acted improperly or wrongfully with respect to the landlord's cancellation of the appellee's lease. Because the lease was terminable at will, taken in the light most favorable to the appellee, the most that the record shows is that the appellants induced GLM to exercise its option to cancel by offering it a better deal than the one it had with the appellee, that, in other words, the appellants successfully and legitimately competed for the space. The evidence on which the appellee relies largely concerned the appellants' conduct subsequent to GLM's decision to cancel the lease or their conduct toward the appellee. As a result, it simply does not tend to prove that the appellants acted improperly in inducing that decision.

The appellee's argument that motive or intent alone is sufficient to establish the appellants' liability in this case is completely misplaced. To be sure, the significance of motive or intent has been extensively addressed in our cases, as well as by the commentators. *See e.g. Natural Design, Inc.,* 302 Md. at 72 n. 12, 485 A.2d at 675–76 n. 12, quoting Prosser, *Torts* § 129, pp. 927–928 (4th ed. 1971); *Lee,* 316 Md. at 159–60 n. 7, 557 A.2d at 975–76 n. 7, quoting Restatement (Second) of Torts § 767, comment d, at 32–33; *Gardiner Dairy Company,* 107 Md. at 567, 69 A. at 409. As we have seen, interference with prospective contractual relationships requires both a tortious intent and wrongful conduct. While, under some circumstances, there may be a significant interplay between motive and conduct, where the conduct inducing the termination of a contract terminable at will is legitimate competition, only one of the requirements is met. *See Lee,* 316 Md. at 158–60, 557 A.2d at 975–977 (discussing that interplay in context of a claim for tortious interference allegedly caused by a breach of a contract in which both the plaintiff and the defendant were parties); Restatement (Second) of Torts, § 767,[9] comment d. Patently, where the defendant acts prop-

9. Section 767 provides:

erly, he or she does not tortiously interfere with a plaintiff's prospective contractual relations even though that is the necessary, and intended, consequence of the competition.

### III.

The appellants ask that we review and strike down, as violative of due process, the punitive damages judgment entered against them.[10] Their request is based upon the teachings of *Pacific Mutual Life Insurance Company v. Haslip,* 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), as interpreted by the Court of Special Appeals in *Alexander & Alexander v. Evander,* 88 Md.App. 672, 596 A.2d 687 (1991), *cert. denied,* 326 Md. 435, 605 A.2d 137 (1992), after remand, *cert. granted,* 331 Md. 284, 627 A.2d 1063. Pointing out that, in *Evander,* the court enumerated six factors which are proper subjects for jury instructions and which, when "[t]aken together, ... suffice ... 'reasonably [to] accommodate [the defendant's] interest in rational decisionmaking and [the State's] interest in meaningful and individualized assessment of appropriate deterrence and retribution,'" *Id.* at 716, 596 A.2d at 708–09, quoting *Haslip,* 499 U.S. at 20, 111 S.Ct. at 1044, 113 L.Ed.2d at 21, they maintain that instructions given in this case omitted at least four of those factors, namely

---

In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interest sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference, and

(g) the relations between the parties.

10. Our disposition of the malicious interference with contract count necessarily invalidates the punitive damages awarded in connection with that count.

(1) That punitive damages may be imposed only when there is outrageous conduct;

(2) That punitive damages may be awarded only upon a showing of "actual malice" on the part of the defendant;

(3) That an award of punitive damages must relate to the degree of culpability exhibited by a particular defendant and that party's ability to pay; and

(4) That punitive damages represent a civil fine and that such should be imposed on an individual basis.

Appellant's brief at 16–17. Moreover, the appellants assert that they were denied due process because the trial court did not exercise adequate judicial oversight of the jury's punitive damage award, again contrary to the *Haslip* requirement; the trial court did not hold a post trial hearing on whether the punitive damage award was excessive and the standard by which it was made, issues they claim they raised in post trial motions. Penultimately, the appellants maintain that they were denied due process by the amount of the judgment, which was excessive to the point of being unconscionable. The appellants' final contention is that the trial court's instruction on burden of proof was incorrect. Despite the recently announced requirement that entitlement to punitive damages be shown by clear and convincing evidence, *see Owens–Illinois v. Zenobia*, 325 Md. 420, 601 A.2d 633 (1992), the court instructed that only a preponderance of the evidence was necessary.

None of these arguments was made in the trial court. The appellants filed motions for new trial, for revision of judgment, and for judgment notwithstanding the verdict, advancing identical grounds for each:

3. That there was not legally sufficient evidence to prove that the defendants, either jointly or individually, misappropriated the trade name of the plaintiff.

4. That there was not legally sufficient evidence to support the elements of tortious interference of contract.

5. That there was not legally sufficient evidence to support an award of punitive damages, or willful or wanton behavior,

either directly or indirectly, or on the part of any of the defendants.

6. There was not legally sufficient evidence to submit the defendant, Sandra J. Macklin, as a defendant to the jury in Count I or Count II.

7. That the jury did not properly consider the economic circumstances of any of the defendants in awarding and assessing the issue of punitive damages as is required by law.

8. That during the trial herein the court made errors in evidence, including the admission of documents and testimony over the objection of the defendants, that severely prejudiced the defendants.

9. That the verdict in this matter is clearly excessive.

10. That the damages have no relations to evidence presented in this case and is excessive and grossly disproportionate to the allegations contained in the case therein.

The appellants also filed a Memorandum In Support Of Motion For New Trial, Motion For Judgment Notwithstanding The Verdict, Motion For Revision Of Judgment And/Or Remitter. The memorandum addressed the sufficiency of the evidence to establish malicious interference with contract, whether the damages awarded were excessive, the propriety of submitting Sandra J. Macklin's culpability to the jury, and the sufficiency of the evidence to prove misappropriation of trade name. In short, the appellants did not make, at the trial, a constitutional challenge to the jury instructions or the procedures pertaining to the award of punitive damages. And notwithstanding that *Evander*, 88 Md.App. 672, 596 A.2d 687, had been decided six and one-half months prior to the verdict in this case and *Haslip*, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1, which *Evander* explicated, had been decided even earlier, in neither the motions nor the memorandum did the appellants raise any constitutional issues. Neither mentioned either *Haslip* or *Evander*. Nevertheless, that is the entire thrust of the appellants' brief on appeal—that the jury instructions did not comport with due process as defined in *Haslip*

and elucidated in *Evander;* that the post-judgment review of the punitive damages award did not comport with due process and that the punitive damages award, considered in light of its predicate, the compensatory damages, does not pass constitutional muster either.[11]

In *Evander,* the trial of which predated the decision in *Haslip,* the defendant made its due process argument for the first time on appeal, even though "the principles enunciated in [*Haslip*] were not pulled out of the ether; they abounded in the literature, had been raised, though not decided, in earlier decisions of the Supreme Court, and were even then being presented to courts and juries throughout the country." *Id.* 88 Md.App. at 708, 596 A.2d at 705. The Court of Special Appeals, while recognizing that the defendant may have waived the arguments, nevertheless exercised its discretion under Maryland Rule 8–131(a) to consider the due process contentions in light of *Haslip,* "given the size of the punitive award, . . . the amount of the compensatory award, the nature of the conduct on which those awards were based, and the fact that, under *Haslip,* both the amount of punitive awards and the procedure for their determination are now clearly subject to due process constraints." *Id.* at 708–09, 596 A.2d at 705.[12] The appellant asks that we follow the Court of Special Ap-

---

**11.** In their motions and memorandum, the appellants did allege that the punitive damages award was excessive in relationship to the compensatory damages award. They did not pursue that nonconstitutional argument in their brief; hence, they have waived it. *See, e.g., Moats v. City of Hagerstown,* 324 Md. 519, 525, 597 A.2d 972, 975 (1991); *Muhl v. Magan,* 313 Md. 462, 480–81, 545 A.2d 1321, 1330–31 (1988); *Bd. of Ed. for Dorchester Co. v. Hubbard,* 305 Md. 774, 787, 506 A.2d 625, 631 (1986); *Ricker v. Abrams,* 263 Md. 509, 283 A.2d 583 (1971); *Harmon v. State Roads Comm'n,* 242 Md. 24, 217 A.2d 513 (1966); Md.Rule 8–504(c).

**12.** On remand, a circuit court jury awarded the plaintiff a total of $5 million in punitive damages against two defendants, which was sustained by the trial judge. Upon the defendant's petition, see Petition No. 261, September Term 1993, we granted certiorari to consider, *inter alia,* the matter of post judgment review of punitive damages awards. 331 Md. 284, 627 A.2d 1063 (1993). Argument in the case, No. 53, September Term, 1993, was heard on January 6, 1994.

peals' example in *Evander* and, notwithstanding that they were not raised below, exercise our discretion to review their due process contentions. That the *Evander* Court exercised its discretion to review an issue neither raised in nor decided by the trial court, *see* Maryland Rule 8–131(a), is not dispositive of our exercise of discretion in this case. Both *Haslip* and *Evander* had been decided some six months before trial of this case. And since *Evander* focused on the very issues that the appellants ask us to review, there is no basis for excusing their failure to raise them in the circuit court. Certainly the appellant should have been aware of both *Haslip* and *Evander* and the principles they enumerated. Accordingly, we decline the appellants' invitation to exercise our discretion despite their failure to preserve the due process issues.

*Zenobia* does require that entitlement to punitive damages be established by clear and convincing evidence, a principle of which the appellants should have been aware at trial. *Zenobia* was decided February 14, 1992, and the trial of the instant case occurred between April 13 and 17, 1992. Nevertheless, the appellants requested that the jury be instructed in accordance with the Maryland Civil Jury Instructions. Those instructions defined the proof required as "a preponderance of the evidence." The trial court complied with the appellants' request. The appellants have waived the issue and, under the circumstances, we decline to exercise our discretion to relieve them of that waiver.

*JUDGMENT AS TO THE MALICIOUS INTERFERENCE WITH CONTRACT COUNTS, REVERSED; JUDGMENT ON THE MISAPPROPRIATION OF TRADE NAME COUNT AFFIRMED.*

*COSTS TO BE PAID ONE–HALF BY THE APPELLANTS AND ONE–HALF BY THE APPELLEES.*