**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

THE PRUDENTIAL REAL ESTATE
AFFILIATES, INCORPORATED,
Plaintiff-Appellant,

v.

LONG & FOSTER REAL ESTATE,
INCORPORATED,
Defendant-Appellee,

No. 99-1357

and

HURSEY PORTER & ASSOCIATES,
INCORPORATED, formerly doing
business as The Prudential Porter &
Associates; RAYMOND HURSEY
PORTER,
Defendants.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Andre M. Davis, District Judge.
(CA-97-2542-AMD)

Argued: January 26, 2000

Decided: March 6, 2000

Before MICHAEL, TRAXLER, and KING, Circuit Judges.

_____

Reversed and remanded by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** William Stewart O'Hare, Jr., SNELL & WILMER, L.L.P., Irvine, California, for Appellant. Christopher Harry Grigorian, ARENT, FOX, KINTNER, PLOTKIN & KAHN, P.L.L.C., Washington, D.C., for Appellee. **ON BRIEF:** Richard A. Derevan, Julianne Sartain, SNELL & WILMER, L.L.P., Irvine, California; Matthew G. Dobson, SAUL, EWING, WEINBERG & GREEN, L.L.C., Baltimore, Maryland, for Appellant. Michael M. Eaton, ARENT, FOX, KINTNER, PLOTKIN & KAHN, P.L.L.C., Washington, D.C., for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Prudential Real Estate Affiliates, Inc. ("Prudential") appeals from the granting of summary judgment against its claim of tortious interference with a contract asserted against Long & Foster Real Estate, Inc. ("Long & Foster"). We reverse and remand to the district court for trial.

I.

Hursey Porter was a well-established and well-respected real estate broker in Salisbury, Maryland, having held offices in or been honored by various local, state, and national real estate organizations. In 1994, Porter entered into a seven-year franchise agreement with Prudential. The agreement provided that Porter could not act as a real estate broker for or be employed by any other company prior to the expiration of the agreement without Prudential's prior written consent. The agreement also prohibited Porter from diverting any business from Prudential to any other real estate business. The franchise agreement

2

contained very specific provisions governing the sale of the business during the term of the agreement. In essence, these provisions required Porter to obtain Prudential's prior written consent to any sale or transfer of the business and gave Prudential the right of first refusal. The agreement provided, however, that Prudential's consent to a proposed sale could not be unreasonably withheld.

Unfortunately, Porter did not fare well as a Prudential franchisee. He lost several of his best agents to competitors, which he attributed at least in part to the franchise service fees that Prudential deducted from the agents' commissions. Porter also believed that he was not receiving the amount of relocation and referral business promised to him by Prudential. Porter's financial situation deteriorated to the extent that by January 1997, it was clear to Porter that he "was in some pretty rough waters." J.A. 174. Among other things, Porter's company owed more than $40,000 for advertising in the local newspaper, and the newspaper was threatening to close Porter's account if the balance was not paid. In addition, another real estate firm with which Porter had previously been affiliated threatened to enter a confession of judgment against Porter on May 1, 1997, if he did not pay a promissory note with an overdue balance of almost $150,000. At approximately the same time, Porter, who had lung cancer in 1992, began experiencing additional health problems, including a "stress-related" trip to the emergency room in January 1997. J.A. 738.

In late 1996 or early 1997, Porter sought the advice of an accountant. The accountant reviewed Porter's financial situation and noted that Porter had borrowed all the money he could from banks and relatives, and the possibility of filing for bankruptcy was discussed. The accountant stated in his deposition that, given Porter's financial circumstances in early 1997, the business would not be able to continue without an "influx of cash." J.A. 700.

In February 1997, Porter contacted an independent broker about the possibility of merging their firms. Those discussions failed.

On March 10, 1997, Ruth Carrier, a Prudential representative, met with Porter. During that meeting, Porter told Carrier about his health and financial problems. Carrier told Porter that if he did not "want to be in this business anymore, let me help you. Let me know because

3

we can help you get out." J.A. 400. Porter, however, did not respond to Carrier's overture.

Around mid-March 1997, Porter engaged in discussions with Long & Foster, the country's third-largest independent real estate brokerage company, about the possibility of Long & Foster purchasing the business.[1] At Porter's request, the parties signed a document requiring them to keep the negotiations secret. That document was later destroyed. During the discussions, Porter informed Long & Foster that he had about three years remaining on his franchise agreement with Prudential.

The parties eventually reached an agreement for the sale of Porter's business to Long & Foster. The agreement was signed on April 18, 1997, and took effect on May 1, 1997. Among other things, the agreement provided that Porter would retain 100 percent of the commissions earned from sales pending as of May 1, 1997, that Long & Foster would assume the lease for the business property, that Long & Foster would purchase for $40,000 certain furniture and equipment belonging to the business, and that Long & Foster would advance Porter $85,000 against his future earnings under the agreement. It is undisputed that Porter did not inform Prudential of his discussions with Long & Foster until ten days after he signed the agreement selling the business.

Prudential filed this action against Porter and Long & Foster, asserting a breach of contract claim against Porter and a claim of tortious interference with a contract against Long & Foster. On cross-motions for summary judgment, the district court ruled against Prudential on its tortious interference claim.[2] The district court determined that "[n]o later than March 10, 1997, Mr. Porter had decided that he would not live up to his agreement with Prudential." J.A. 1122. The court concluded that because of Porter's health and finan-

---------------------------------------------------------------

[1] As will be discussed later, whether Porter contacted Long & Foster or whether Long & Foster contacted Porter is hotly disputed by the parties.

[2] The district court also ruled that, as a matter of law, Porter breached his contract with Prudential. Prudential and Porter thereafter entered into a settlement, and Porter was dismissed from the action.

4

cial problems, Porter "would have been unable to comply with the terms of his Prudential agreement on and after May 1, 1997 . . . . Prudential [therefore] was not injured by any act of Long and Foster. And Long and Foster, as a matter of law, did not induce Mr. Porter to repudiate his contract." J.A. 1125.

II.

On appeal, Prudential contends that it presented sufficient evidence on each element of its tortious interference claim against Long & Foster and that the district court therefore erred by granting summary judgment on the claim. We review de novo the district court's decision to grant summary judgment, drawing all reasonable inferences and viewing all evidence in the light most favorable to the non-moving party. See Halperin v. Abacus Tech. Corp. , 128 F.3d 191, 196 (4th Cir. 1997); Porter v. United States Alumoweld Co., 125 F.3d 243, 245 (4th Cir. 1997).

Under Maryland law,[3] a plaintiff claiming intentional interference with contractual relations generally must establish that: (1) a contract or legally protected interest existed between the plaintiff and a third party; (2) the defendant knew of the contract; (3) the defendant intentionally induced the third party to breach or otherwise rendered performance of the contract impossible; (4) the interference was wrongful or without justification; (5) the contract was subsequently breached or terminated by the third party; and (6) the plaintiff suffered damages as a result. See Bagwell v. Peninsula Reg'l Med. Ctr., 665 A.2d 297, 313 (Md. Ct. Spec. App. 1995); see also Wilmington Trust Co. v. Clark, 424 A.2d 744, 754 (Md. 1981) ("We have recognized that a third party who, without legal justification, intentionally interferes with the rights of a party to a contract, or induces a breach thereof, is liable in tort to the injured contracting party.").

_____

[3] The parties do not dispute that Maryland law governs this case. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941) (holding that a federal court sitting in diversity must apply the choice-of-law rules of the forum state); Ward v. Nationwide Mut. Auto. Ins. Co., 614 A.2d 85, 91 n.8 (Md. 1992) ("[A] Maryland court ordinarily will apply the substantive tort law of the place where the tort occurred under the doctrine of lex loci delicti.").

5

However, a claim for intentional interference with contractual relations "has two general manifestations" and "is committed when a third party's intentional interference with another in his or her business or occupation induces a breach of an existing contract, or absent an existing contract, maliciously or wrongfully infringes upon an economic relationship." Macklin v. Robert Logan Assocs., 639 A.2d 112, 117 (Md. 1994). "[W]here a contract between two parties exists, the circumstances in which a third party has a right to interfere with the performance of that contract are more narrowly restricted. A broader right to interfere with economic relations exists where no contract or a contract terminable at will is involved." Natural Design, Inc. v. Rouse Co., 485 A.2d 663, 674 (Md. 1984).

Therefore, in cases involving interference with economic relations, which includes cases where the contract is terminable at will, the plaintiff must prove both "a tortious intent and improper or wrongful conduct." Macklin, 639 A.2d at 119. But "[w]hen the existing contract is not terminable at will, inducing the breach, even for competitive purposes, is itself improper and, consequently, not `just cause' for damaging another in his or her business." Id. at 120. Because the contract at issue in this case is not terminable at will, Prudential is not required to separately establish the fifth element of its interference claim by demonstrating that Long & Foster's interference was wrongful or without justification.**4**See id. ("[W]here there is an existing contract, not terminable at will, between a plaintiff and a third party, acts by a defendant to induce the third party to breach that contract are, themselves, improper and wrongful."); see also Restatement (Second) of Torts § 768(2) (1979)**5** ("The fact that one is a competitor of

_____

**4** The Maryland Court of Appeals raised some question about this principle in Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc., 650 A.2d 260 (Md. 1994), although the court specifically declined to "further explore this matter." 650 A.2d at 270 n.18. At issue in Alexander, however, was the broader form of the tort, which clearly requires that the defendant's conduct be wrongful. Moreover, because Alexander did not overrule Macklin, we conclude that Macklin properly states Maryland law with regard to a claim of interference with a contract not terminable at will.

**5** When presented with claims of tortious interference with a contract, Maryland courts frequently look to the Restatement for guidance. See, e.g., Alexander, 650 A.2d at 271-72; Macklin, 639 A.2d at 117-22; Sharrow v. State Farm Mut. Auto. Ins. Co., 511 A.2d 492, 499 (Md. 1986).

6

another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will.").

The parties do not dispute that Porter breached his contract. The question, then, is whether Prudential presented sufficient evidence to create a genuine issue of material fact as to each of the remaining elements. We conclude it did.

A. Existence of the Contract

Clearly, a valid contract existed between Porter and Prudential; Long & Foster makes no attempt to dispute that on appeal. The district court, however, ruled that a covenant not to compete executed by Porter was unenforceable under California law,[6] and that Prudential's interference claim, therefore, could not be based upon a breach of the covenant. Although the parties on appeal press the issue of the enforceability of the covenant, we need not resolve that question. Even if the covenant were unenforceable, there is no contention that the franchise agreement would somehow become invalid or unenforceable. Prudential's interference claim, therefore, is viable without regard to the covenant not to compete. See Fraidin v. Weitzman, 611 A.2d 1046, 1056 (Md. Ct. Spec. App. 1992) ("Only a valid agreement can support a claim for tortious interference with contract; an invalid agreement cannot."). Because there was a valid contract between Prudential and Porter, we leave the question of the enforceability of the covenant not to compete for the district court on remand.

B. Knowledge of the Contract

The evidence presented by Prudential established that Long & Foster knew that Porter had a contract with Prudential, a fact confirmed by the affidavits and deposition testimony of Long & Foster's own representatives. To the extent that Long & Foster attempts to argue that it is insulated from liability because it did not know about the franchise agreement's restrictions on the sale of the business, the argument is without merit.

_____

[6] The franchise agreement designated the law of California as governing the contract.

7

Long & Foster is a major "player" in the real estate business, and prior to the transaction at issue in this case, Long & Foster had acquired other real estate offices that were operating as franchises. Prudential's evidence established that while some national real estate brokerage franchisors do not restrict the ability of the franchisee to sell or transfer the business, many other franchisors not only restrict sales and transfers "but enforce that position." J.A. 510. Moreover, despite Long & Foster's knowledge of the existence of the contract, a Long & Foster vice-president stated in his deposition that Long & Foster never asked Porter for a copy of the franchise agreement. In addition, Long & Foster's president recognized that Porter would be required to break his contract with Prudential in order to close the deal with Long & Foster. Although Porter assured Long & Foster that he would "take care of" his obligation to Prudential, J.A. 348, Prudential's evidence indicates that Porter never told Long & Foster that he actually resolved the matter, and that Long & Foster never asked. In our view, a factfinder could reasonably infer from this evidence that Long & Foster knew or should have known of the terms of the contract between Porter and Prudential.

Viewed in the light most favorable to Prudential, the evidence establishes that Long & Foster knew of the existence of the franchise agreement and had ample opportunity to educate itself as to its terms. Long & Foster cannot, therefore, at this stage of the proceedings, insulate itself from Prudential's tortious interference claim by asserting that it did not know about the specific terms of the franchise agreement. See Stannard v. McCool, 84 A.2d 862, 867 (Md. 1951) (To be liable for intentional interference with a contract, "the actor must have knowledge of the business expectancy with which he is interfering . . . . But it is not necessary that the actor appreciate the legal significance of the facts which give rise to the contractual duty. If he knows those facts, he is subject to liability even though he is mistaken as to their legal significance and believes that there is no contract or that the contract means something other than what it is judicially held to mean." (internal quotation marks omitted)); cf. St. George Antiochian Orthodox Christian Church v. Aggarwal, 603 A.2d 484, 490 (Md. 1992) ("There is more than one mental state that may constitute `knowledge.' The first and highest form of `knowledge' is actual knowledge, that is, an actual awareness or an actual belief that a fact exists. A second form of `knowledge' is what has

8

often been called `deliberate ignorance' or `willful blindness.' The latter form of `knowledge' exists where a person believes that it is probable that something is a fact, but deliberately shuts his or her eyes or avoids making reasonable inquiry with a conscious purpose to avoid learning the truth." (citation omitted)). **7**

Accordingly, we conclude that Prudential presented sufficient evidence of Long & Foster's knowledge of the contract between Porter and Prudential to satisfy, for summary judgment purposes, the knowledge element of its tortious interference claim.

### C. Inducement

As noted above, the district court concluded that, as a matter of law, Long & Foster did not induce Porter to breach his contract with Prudential. The district court determined that Porter had decided by March 1997 to breach his agreement with Prudential and that Porter could not have complied with the terms of the agreement after May 1, 1997. The court therefore concluded that Long & Foster's offer to purchase the business was not "the cause in fact of Mr. Porter's breach of his contract with Prudential." J.A. 1122. Prudential contends that the district court erred by concluding that Long & Foster did not induce Porter to breach his contract with Prudential. We agree.

An action for interference with contractual relations lies only if the defendant's conduct "induce[s] the breach or termination of the contract." Macklin, 639 A.2d at 119. A defendant is not liable for interference if the defendant "merely enters into an agreement with the other with the knowledge that the other cannot perform both it and the contract with the third person." Restatement (Second) of Torts § 766 cmt. n. In our view, the record suggests much more than Long & Foster merely entering into a contract with Porter with the knowledge

---

**7** The district court likewise concluded that Long & Foster had sufficient knowledge of the contract, stating that "clearly, on the record as it stands, Prudential would be entitled to a willful blindness instruction or evaluation under the evidence to determine whether or not Long & Foster purposely avoided learning the details and parameters of Mr. Porter's agreement with Prudential." J.A. 1123.

9

that Porter would be required to breach his contract with Prudential, and we think a factfinder reasonably could conclude that Long & Foster intentionally induced Porter to breach his contract with Prudential.

Prudential presented evidence that Long & Foster approached Porter about selling the business, a fact which is relevant to a determination of whether Long & Foster induced Porter to breach his contract. See Sharrow, 511 A.2d at 500-01. In a newspaper article about the sale, Mark Holloway, Long & Foster's regional manager, stated that "Porter had the performance and the quality most compatible with ours, so we approached them with an offer." J.A. 1101. Prudential also submitted an affidavit from the reporter who wrote the story confirming that Holloway made the statements reported in the article.

Porter and Holloway, however, stated in their depositions that it was Porter who first approached Long & Foster about buying the business. Long & Foster contends that the newspaper article is "perfectly consistent" with Porter's and Holloway's statements because the quote in the article merely referred to Long & Foster's "formal written offer" to Porter, which was made after Porter contacted Long & Foster. While this may be a completely reasonable interpretation of Holloway's statement in the article, the statement may also reasonably be interpreted to mean that Long & Foster conceived of the idea to purchase the business and initiated the negotiations. Because both interpretations of Holloway's statement are reasonable, we cannot, when reviewing a grant of summary judgment, simply accept Long & Foster's interpretation over that of Prudential. See Columbia Union College v. Clarke, 159 F.3d 151, 164 (4th Cir. 1998) ("Where the party challenging the grant of summary judgment can show that the inferences they suggest are reasonable in light of the competing inferences, summary judgment must be denied." (internal quotation marks omitted)), cert. denied, 119 S. Ct. 2357 (1999).

The favorable terms of the agreement between Porter and Long & Foster are also evidence tending to establish that Long & Foster induced Porter to breach the contract. The deal ultimately reached between Porter and Long & Foster provided for the payment of somewhat more than book value for Porter's equipment, assumption of Porter's lease of the premises, and an advance to Porter of $85,000, which he used to pay some of his many debts. Given Long & Foster's

10

knowledge of Porter's dire financial straits, a finder of fact could reasonably infer that the attractive package offered by Long & Foster induced Porter to breach his contract with Prudential. See Restatement (Second) of Torts § 766, cmt. k ("There is no technical requirement as to the kind of conduct that may result in interference with the third party's performance of the contract. The interference is often by inducement. The inducement may be any conduct conveying to the third person the actor's desire to influence him not to deal with the other . . . . Or it may be a statement unaccompanied by any specific request but having the same effect as if the request were specifically made . . . . Or it may be the promise of a benefit to the third person if he will refrain from dealing with the other."); Restatement § 766 cmt. m ("Another method of inducing B to sever his business relations with C is to offer B a better bargain than that which he has with C."); see also Cumberland Glass Mfg. Co. v. De Witt, 87 A. 927, 931-32 (Md. 1913) (holding that a claim of interference with a contract was properly submitted to the jury in case where the evidence tended to show that defendant who knew of contracts for the sale of flasks between the plaintiff and Mallard Distilling Company"intentionally deprived the plaintiff of the fruits of the contracts by offering the Mallard Company lower prices on the flasks"), aff'd, 237 U.S. 447 (1915).

We recognize that there is evidence in the record showing that Porter was experiencing severe financial difficulties and that his business was on the brink of failure. Contrary to the district court's conclusion, however, the evidence presented by the parties does not establish as a matter of law that Porter had "repudiated" his contract with Prudential by March 10, 1997.

First, Porter did not respond when specifically questioned by a Prudential representative about whether he wanted to remain in the real estate business. In addition, Porter's wife stated in her deposition that it was the conversations with Long & Foster that"triggered" Porter's decision to sell the business. J.A. 1005. Finally, Porter himself stated in a letter to Prudential after the sale that he made a "sudden" decision to sell the business in April 1997. J.A. 290. This evidence creates a genuine issue of material fact as to whether Porter decided to breach his contract before the discussions with Long & Foster began.

11

Second, even if the evidence established that Porter had decided to sell the business before he first talked to Long & Foster, that evidence would not support the conclusion that, as a matter of law, Porter had "repudiated" the contract before entering into the discussions with Long & Foster. The Prudential contract did not prohibit the sale of the franchised business. Instead, it prohibited sale of the business without consent, consent which the contract provided could not be unreasonably withheld. Given Porter's undeniable financial problems, the poor performance of the office, and the defections of some of his top sales staff, it may be that Prudential would have consented to the sale. Alternatively, the terms of the deal between Long & Foster and Porter demonstrate that, despite the poor performance of the business, it nonetheless had some real value. Prudential, then, might have been willing to exercise its right of first refusal, so that it could retain its presence in the Salisbury area. In fact, Prudential presented evidence establishing that another Prudential franchisee might have been interested in buying Porter's business if Porter had contacted him before closing the deal with Long & Foster.

To conclude, as did the district court, that Long & Foster did not induce the breach because Porter had already "repudiated" the contract would require us to ignore the conflicting evidence and to overlook the options available to Porter under the franchise agreement, neither of which we may do at this stage of the proceedings.

Long & Foster also contends that it did nothing to prevent Porter from complying with the requirements of the franchise agreement and that it therefore cannot be held liable for Porter's unilateral decision to breach the contract. We disagree.

The evidence in the record indicates that, prior to the purchase of Porter's business, Long & Foster was hoping to expand its operations in the area. In fact, Holloway stated in the newspaper article that Long & Foster "had been looking to expand, but recruiting one agent at a time is a long, cumbersome process." J.A. 1101. Porter had been in the real estate business for many years and was well-respected in the industry. His name and reputation, therefore, would be an asset to Long & Foster. And because Prudential was left with no affiliated office in the Salisbury area after the sale, Long & Foster's purchase of the business also eliminated one of its competitors from the market.

12

Thus, Long & Foster's purchase of the business reduced its competition and gave it immediate access to an office, equipment, and an additional sales force in an area where it had been hoping to expand. If Porter had complied with the franchise agreement by notifying Prudential about Long & Foster's offer, Prudential might well have exercised its right of first refusal, which would have required Long & Foster to continue the "long, cumbersome process" of trying to expand. Thus, it would not be unreasonable to infer from the evidence of the good fit between what Long & Foster needed and what Porter had to offer that Long & Foster sought out Porter and induced him to breach his contract with Prudential.

Moreover, when Porter and Long & Foster first began discussing the sale, they signed a document requiring them to keep the negotiations secret, a document that was later destroyed. Porter stated in his deposition that he suggested the confidentiality agreement to keep his agents and others from learning about the deal prematurely. While this certainly is a reasonable explanation of the confidentiality agreement, Long & Foster's willingness to keep the negotiations secret could also be viewed as an indication that it believed that the only way the sale would go through was if Prudential did not learn about the negotiations.

We conclude that Prudential presented evidence establishing a genuine issue of material fact as to whether Long & Foster intentionally induced Porter to breach his contract with Prudential and, therefore, that the district court erred by granting summary judgment.**8**

_____

**8** Long & Foster also argues that the evidence in this case is insufficient to show that it acted with the requisite intent, because there is no evidence that "Porter's breach was anything but a mere indirect consequence of Long & Foster's legitimate activity." Brief of Appellee at 55. To the extent that, under the facts of this case, Long & Foster's "intent" should be viewed separate from its "inducement," we believe that the evidence that creates a genuine issue of fact as to whether Long & Foster induced Porter to breach the contract likewise creates a genuine issue of material fact as to whether Long & Foster intended to induce the breach of contract.

13

D. Damages

While Long & Foster does not dispute that Prudential suffered damages as a result of Porter's breach of contract, it does contend that any damages were not caused by Long & Foster's actions. Long & Foster contends that "[b]ecause the undisputed evidence showed that Porter's business could not continue past May 1,[Prudential] cannot establish that Long & Foster's conduct in any way caused its injury." Brief of Appellee at 39. We disagree.

As discussed above, the Prudential franchise agreement itself provided Porter with ways to terminate his relationship with Prudential without breaching the contract. Thus, even if Porter's business could not have continued after May 1, that does not compel the conclusion that Porter would have breached the contract on May 1 without Long & Foster's involvement. Moreover, even if the only reasonable inference from the evidence presented were that Porter would have breached the franchise agreement as of May 1, that would not establish as a matter of law that Prudential would have suffered the full extent of the damages it suffered after Porter breached the contract by selling the business to Long & Foster, one of Prudential's main competitors. We therefore conclude that Prudential presented sufficient evidence of damages caused by Long & Foster's conduct to withstand Long & Foster's motion for summary judgment.

III.

Because Prudential presented evidence establishing a genuine issue of material fact as to each element of its tortious interference with a contract claim, we conclude that the district court erred by granting summary judgment in favor of Long & Foster. Accordingly, the district court's order granting summary judgment is hereby reversed and the case is remanded to the district court for trial.

REVERSED AND REMANDED

14