**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JEFFREY SCOTT BRUETTE; BRIAN
MICHAEL KUEHN; PRISM MULTIMEDIA,
INCORPORATED,
                    *Plaintiffs-Appellants,*

                    v.

MONTGOMERY COUNTY, MARYLAND;
THE STATE OF MARYLAND; ERROL
BIRCH, Individually and in his
official capacity of Detective,
Montgomery County Police
Department; DONALD INMAN,
Individually and in his official
capacity of Detective, Montgomery
County Police Department,
                    *Defendants-Appellees,*

                    and

DOUGLAS M. DUNCAN (or his
successor), County Executive,
Montgomery County; MONTGOMERY
COUNTY POLICE DEPARTMENT; ALEX
FOSTER, Individually and in his
capacity as Assistant Maryland
State Attorney,
                    *Defendants.*

No. 02-1441

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, District Judge.
(CA-00-2324-JFM)

Argued: April 4, 2003

Decided: June 24, 2003

Before KING, Circuit Judge, HAMILTON, Senior Circuit Judge, and Robert E. PAYNE, United States District Judge for the Eastern District of Virginia, sitting by designation.

Affirmed by unpublished per curiam opinion.

**COUNSEL**

**ARGUED:** Douglas William Tyrka, ROSENAU & ROSENAU, Washington, D.C., for Appellants. Sharon Veronica Burrell, Principal Counsel for Self-Insurance Appeals, Rockville, Maryland, for Appellees. **ON BRIEF:** Charles W. Thompson, Jr., County Attorney, Patricia P. Via, Associate County Attorney, Charles L. Frederick, Associate County Attorney, Rockville, Maryland, for Appellees.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

**OPINION**

PER CURIAM:

Jeffrey Scott Bruette, Brian Michael Kuehn and Prism Multimedia, Inc., a corporation that is wholly owned by Bruette, appeal from an order granting summary judgment against them, as well as from several orders regulating discovery. For the following reasons, the order granting summary judgment and the orders regulating discovery are affirmed.

I.

The multi-count complaint in this action ensued the arrest of Bru-

ette and Kuehn on several related charges: (1) filming a person under 18 years of age ("J.C.") engaging in an obscene act or sexual conduct; (2) distributing those films; (3) possessing child pornography; (4) child abuse of J.C., including unnatural or perverted sexual practices, by a person having temporary or permanent custody of an individual under 18 years of age; and (5) wilfully contributing to, or encouraging any act which results in, a violation of law rendering a child (J.C.) either delinquent or in need of supervision or assistance (sometimes referred to in the record as "contributing to the condition of a minor").[1] The fact scenario that formed the basis for the charges against Bruette and Kuehn began in 1998 when J.C., who was then age 16, began visiting the residence shared by Bruette and Kuehn.

As time passed, J.C.'s visits became more frequent and longer in duration. While visiting, J.C. used the plaintiffs' computer, watched their television and played with their dogs. Because J.C. was spending considerable time at the residence, Bruette decided to inform J.C., and later J.C.'s mother, that Bruette and Kuehn were in a personal relationship and lived what Bruette termed "an alternate lifestyle." Those revelations did not diminish either the frequency or the duration of J.C.'s visits.

In January 1999, Bruette began to suspect that J.C. was stealing some of the expensive electronic gear and gadgetry that he and Kuehn kept in the basement of their house. Consequently, Bruette installed a surveillance camera, or "nanny cam," in the basement, allowed J.C. to remain in the basement alone, and joined Kuehn in a room upstairs where they could view the surveillance on a television monitor.

They saw no theft. Instead, they observed J.C. engaging in sexual acts with the dogs that Bruette and Kuehn owned. After watching this activity for a while, Bruette and Kuehn decided to record it on videotape. The videotaping of similar activity on the part of J.C. took place the next day and again on the following day.[2]

---

[1] Violations, respectively, of Md. Code Ann., art. 27, § 419(A), Md. Code Ann., art. 27, § 419(A), Md. Code Ann., art. 27, § 419(B), Md. Code Ann., art. 27, § 35(C), Md. Code Ann. § 3-831.

[2] Statements voluntarily made to the police by both plaintiffs described J.C.'s conduct and the recording of it on videotape in detail.

Neither Bruette nor Kuehn interceded to stop J.C.'s conduct when they first observed it. Nor did they disclose J.C.'s conduct to his parents or to any social service agency. Rather, contending that they were at a loss about how to proceed, they elected to allow J.C. to continue the conduct at two separate sessions on the next two ensuing days. However, they did discuss the matter thereafter with some friends, one of whom was a lawyer in another state. Their stated purpose for recording J.C.'s conduct (and each initiated the recording process on different occasions) was to have documentary evidence with which to confront J.C. or to present to his parents in the event that J.C. ever accused Bruette or Kuehn of any impropriety. Bruette and Kuehn also showed these videotapes to a friend. They say that was done to help them ascertain how to proceed.

In March 1999, three months after the activity was recorded, Bruette confronted J.C. about his conduct. However, J.C. was not told about the videotapes of his performances. The record is unclear what else transpired in the confrontation, but J.C.'s visits ceased the next day. After raising the matter with J.C., Bruette and Kuehn made no report of J.C.'s conduct to his parents, assertedly because they knew J.C.'s father to be an ill-tempered, perhaps even violent, man. Nor did they report it to any social service agency.

Then, in June 1999, Bruette discussed the situation with a child service agency employee who mentioned to Bruette, the rather obvious fact, that the videotape could be considered pornographic. Bruette then informed J.C.'s sister of her brother's activities. She, in turn, related the communication to her parents who reportedly were incredulous at her assertion. Then, on July 29, 1999, some six months after observing and filming J.C.'s conduct, Bruette and Kuehn reported the matter to the police, claiming to be in search of help for J.C., but apprehensive that it was necessary to act before they were accused of wrongdoing.[3] They delivered the videotape to the police at the same time.

---

[3]Bruette and Kuehn explained the reporting delay by noting that they had been out of town for protracted periods between January and July and by reciting their indecision respecting how to handle the matter given their understanding about J.C's father's reputation.

The matter was referred immediately to the Pedophile Unit of Montgomery County Police Department where it was assigned to Detective Birch. Shortly thereafter, Birch interviewed Bruette and then Kuehn, taking from each a statement in which the facts summarized above were related in great detail. Birch also interviewed J.C.'s mother and sister and then J.C. In that interview, J.C. told Birch that his activity with the dogs began no later than January 1, 1999; and that, on one occasion, apparently before the first recorded bestiality episode, Bruette had grabbed J.C.'s penis and had related a sexual encounter with a 17 year old boy.

Birch secured arrest warrants for both Bruette and Kuehn for the five charges previously outlined. On the basis of the same facts that supported issuance of the arrest warrant, Birch also received a search warrant for the plaintiffs' home. Bruette and Kuehn were arrested and detained overnight because the arrest took place late in the day and the bondsman had left for the evening. Both were released on bond the next day.

During the period January 1999 to the arrest, Bruette and Kuehn worked at Hughes Networks, Inc. pursuant to a contract between Prism and Hughes. The revenue thereby produced was allegedly the sole income for Prism, and its two employees, Bruette and Kuehn. As part of the investigation, Birch talked to the director of security at Hughes and asked him to check the computers that Bruette and Kuehn used in their work to ascertain whether there was child pornography on those computers. Apparently, Birch did not follow up on that inquiry before the arrest and search warrants were secured and executed. But, in a conversation with Hughes' security director after the arrest, Birch mentioned that Bruette and Hughes had been arrested and outlined the charges. Shortly after Bruette and Kuehn were arrested, Hughes suspended its business dealings with Prism.

Several months thereafter, Bruette pled guilty to wilfully contributing to, or encouraging an act that resulted in, a violation of law rendering a child either delinquent or in need of supervision (contributing to the condition of a child). Bruette was sentenced to probation. Kuehn entered a plea agreement pursuant to which he agreed to perform community service in exchange for a *nolle prosequei* of all charges again him (the parties call this a conditional *nolle prosequei*).

After entry of these pleas, Hughes ceased doing business with Prism entirely.

## II.

The complaint set forth eleven so-called "causes of action," one of which presented federal constitutional law claims through 42 U.S.C. § 1983, the remainder presenting state constitutional and tort claims. The first, and only federal law, count asserted violations of rights conferred by the First, Fifth, Sixth, Eighth and Fourteenth Amendments, all arising, in one way or another, out of the arrest and prosecution of Bruette and Kuehn and the search of their residence.[4] The state constitutional law claims were based on parallel provisions of the Maryland Constitution and were said to have arisen as a consequence of the same events as precipitated the federal constitutional law claims in the first count. The state tort claims were for alleged false arrest and imprisonment, malicious prosecution, abuse of process, assault, battery, negligence, intentional infliction of emotional distress, conversion, and tortious interference with a business relationship.

The complaint was as indiscriminate in naming defendants as it was in positing substantive claims. Thus, in addition to suing Birch and the County, the plaintiffs, for reasons that are difficult to discern, named, as additional defendants, another detective, the County Police Department, the County Executive, an Assistant State's Attorney and the State of Maryland.

However, by the time that summary judgment was granted, the only remaining defendants were Birch and his employer, the County because, by then, all claims against the Police Department, the County Executive, and another County police officer had been volun-

---

[4]The Sixth Amendment claim in the first count was that the plaintiffs were deprived of their right to counsel when they were served with the search warrant outside the presence of their counsel. The district court held that the Sixth Amendment claim lacked merit. It does not appear that the plaintiffs have appealed that aspect of the summary judgment; but, if that issue is somehow intended to be presented on appeal, we, like the district court, find it meritless.

tarily dismissed by the plaintiffs. All state law claims against the County also had been dismissed voluntarily. In deciding a previous motion, not the subject of this appeal, the district court had dismissed all claims against the Assistant State's Attorney, in his official and individual capacities, and the claims against the State of Maryland.

III.

An award of summary judgment is reviewed *de novo*. *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003). Having so reviewed the matter, we affirm the order granting summary judgment, largely for the reasons given by the district court.

A. *The Award Of Summary Judgment On The Plaintiffs' First And Eighth Amendment Claims*

The First Amendment claim was grounded in the plaintiffs' contention that the videotape was a constitutionally protected form of expression because it allegedly was made, *inter alia*, to show to a counseling authority. The plaintiffs argued that the defendants were retaliating against them and punishing them for making, possessing and distributing that protected form of expression. The district court granted summary judgment on the First Amendment claim (and on a claim under a comparable provision of the Maryland Constitution) by finding qualified immunity. Specifically, the district court held that "[c]reative though this argument may be, a law enforcement officer clearly cannot be held civilly liable for having failed to anticipate it."

That theory is not creative. It is simply unsupported by any citation of law in any brief before the district court or in this appeal. And, we know of no decisional support for it. Thus, the district court correctly held that Birch enjoyed qualified immunity. Moreover, because the theory lacks substance at law, the First Amendment claim and the parallel Maryland Constitutional claim are both, as the district court held, albeit without statement of reasons, "facially deficient."

The district court summarily terminated the Eighth Amendment claim for two reasons: (1) the acts alleged to constitute punishment (Birch's discussions with Hughes and Birch's alleged threat to prose-

cute the plaintiffs for animal cruelty if they did not relinquish posses-
sion of their dogs) did not amount to punishment and thus were not
of constitutional import; and (2) the allegedly offending acts both
occurred before conviction, thereby foreclosing application of the
Eight Amendment under *Ingraham v. Wright*, 430 U.S. 651, 671 n.40
(1977). The district court correctly entered summary judgment on the
Eighth Amendment claim for the reasons given in its memorandum
opinion.

### B.   *The Alleged Fifth Amendment Self-Incrimination Claim*

The plaintiffs assert that their rights against self-incrimination were
violated. It is difficult to discern the predicate for this assertion given
that the plaintiffs initiated communications with the police department
and voluntarily made detailed statements. We agree with the district
court that "[t]here is nothing in the record to suggest that plaintiffs
were in custody at the time of the interviews or that their participation
in the interviews was not entirely voluntary." Hence, the district court
properly granted summary judgment on the Fifth Amendment claim.

### C.   *The District Court's Decision Respecting Probable Cause*
*For Arrest, Search And Prosecution*

The district court resolved the remaining federal and state constitu-
tional claims and the state law tort claims arising out of the arrest and
prosecution of the plaintiffs and the search of their house by conclud-
ing that probable cause existed for the arrest of the plaintiffs, the
search of their house and their prosecution. On appeal, the parties
have treated that as the principal substantive issue as to the grant of
summary judgment. So too shall we.[5] Although the complaint does
not mention the Fourth Amendment, the district court properly per-
ceived that the claims respecting the plaintiffs' arrest and prosecution
and the search of their residence must be analyzed as arising thereun-
der, *see Albright v. Oliver*, 510 U.S. 266, 273 (1994), *Graham v. Con-
nor*, 490 U.S. 386, 395 (1989). And, on appeal, the parties have
treated the federal constitutional claims in the first count as controlla-

---

[5]The claim for tortious interference with a business relationship was
not resolved on that ground.

ble by that jurisprudence. The same is true as to the parallel claims under the Maryland Constitution.

The district court concluded that the statements volunteered by Bruette and Kuehn, the videotapes they made of J.C., and Birch's interviews of J.C., his mother and his sister supplied probable cause for Birch to secure a warrant for the arrest of Bruette and Kuehn for sexual abuse of a minor by a custodian, filming a minor during a sex act, distributing and promoting pornography respecting a minor and contributing to the condition of a minor. The district court then concluded that the presence of probable cause disposed of all federal and state constitutional and state law tort claims based on the arrest, the search and the prosecution.

Probable cause for an arrest warrant exists when the facts reasonably show that an offense has been committed and that the person to be arrested has committed it. 3 Wayne R. LaFave, Search and Seizure, § 5.1(q) (1996). Probable cause to search exists when there is "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). As the district court explained in detail, the evidence available to Birch about the conduct of Bruette and Kuehn provided probable cause for the preferring of each of those charges, their arrest on them, the search of their house and their ensuing prosecution.

Like the district court, we conclude that the presence of probable cause forecloses relief on all the federal and state constitutional and tort claims based on the arrest, the search and the prosecution at issue. Hence, we affirm the grant of summary judgment on those claims on the reasoning of the district court.

We also agree with the district court that, because J.C. was over the age of 16 at the time of the events in question, there was not probable cause to support preferring the charge of possession of child pornography under Maryland law[6] or to justify the plaintiffs' arrest thereon. However, as the district court correctly held, that deficiency is of no moment here because there was probable cause to support all the

---

[6]The applicable Maryland statute sets the age of 16 as the determinative age for that offense. The defendants agree.

other charges, and because there is no evidence that Birch acted in bad faith in pressing the defective charge.[7]

IV.

We turn now to the state law claim for tortious interference with a business relationship. The plaintiffs alleged that Birch and the County tortiously interfered with their business relationship with Hughes when, during his investigation, Birch told Hughes that Bruette and Kuehn were under investigation and that they had been arrested. According to Birch, he communicated with Hughes to ascertain whether the plaintiffs had access to computers when they were at Hughes. This, according to the record, is a usual step in the investigation of cases involving child pornography or pedophilia. According to the plaintiffs, Birch made these communications for the purpose of harming their relationship with Hughes.

The district court granted summary judgment for the reason that Hughes learned of the arrest from a newspaper article and from the plaintiffs, not from Birch. The parties agree that the record does not support that conclusion.

---

[7]The plaintiffs asserted a procedural due process claim arising out of a threat by Birch to prosecute them for cruelty to animals if they did not agree to have no more contact with the dogs. The district court correctly held that Birch made no actionable threat because there was probable cause for a charge of animal cruelty.

The plaintiffs also asserted a procedural due process claim grounded in the assertion that the County has not returned the plaintiffs' television and the videotape of J.C. and the dogs. The television was lost while it was being held by the Police Department. The plaintiffs were told to file a claim for reimbursement. The videotape is in the custody of the Montgomery County Juvenile Court. The plaintiffs can petition that court for its return. Under the circumstances of record, there is no actionable wrong, constitutional or otherwise, respecting the television or the videotape that can be attributed to Birch or the County.

Nor is there merit to the plaintiffs' contention that the search of their residence exceeded the scope of the warrant.

As the plaintiffs contend, there are factual disputes about certain aspects of this claim. But, viewed most favorably to the plaintiffs, the record indicates that, as part of standard investigative technique, Birch informed the director of security at Hughes that he was investigating Bruette and Kuehn and asked the director of security to ascertain whether their computers at work contained evidence of child pornography. He also informed Hughes of the arrests which, at the time, were matters of public record.

There is nothing in the record to indicate that inquiries of that nature are not part of the usual investigative procedures for cases involving child pornography. On the other hand, there is evidence that Birch never followed up on this inquiry. The record also shows that Birch did not have a similar check made on the computers at the home shared by Bruette and Kuehn. That evidence permits an inference that Birch was negligent in the discharge of his duties. It also permits an inference that, before hearing back from Hughes, Birch concluded that he had sufficient evidence to prefer charges.

Whatever else may be said about Birch's conduct, however, we can find nothing in it on which a reasonable jury could base a finding that his communications with Hughes were accomplished with the purpose of causing damage to a business relationship. And, under Maryland law, that is an element of a claim for tortious interference with a business relationship. *Macklin v. Robert Logan Associates*, 334 Md. 287, 301, 639 A.2d 112, 119 (1994). Hence, summary judgment was appropriate on that claim, and we affirm on that ground.[8]

## V.

The plaintiffs also appeal from several orders that regulated discovery and from that aspect of the summary judgment order denying the request for discovery under Fed. R. Civ. P. 56(f) that appears in an

---

[8]Although this is not the basis on which the district court granted summary judgment, we may assess this issue on any ground that appears in the record. *Hillson Partners Ltd. Partnership v. Adage, Inc.*, 42 F.3d 204, 210 n.5 (4th Cir. 1994). Further, the parties have addressed this issue adequately in their briefs on appeal.

affidavit filed by Bruette in response to the motion for summary judgment.

The pertinent record shows that: (1) the parties exchanged interrogatories and documents; and (2) depositions were taken of Birch, Detective Inman, four Hughes employees, and two other police officers. Thus, plaintiffs' assertion that they were allowed "virtually no discovery" is simply wrong.

It is correct, however, that the district court exercised its discretion to regulate discovery. Thus, the circumstances under which the district court acted require some explanation.

Well into the course of the case, at a hearing on several motions and with about five weeks remaining before the end of the period allowed for discovery, the parties presented the district court with a dispute about the scope of a protective order respecting information about J.C. in state juvenile court files and the police files. The defendants considered themselves circumscribed in providing documents from their files by a previous state court order restricting disclosure of information about J.C. The plaintiffs wanted access to that information and to the information in the state juvenile court files.

After briefing and argument, the district court proposed that, to head off a proposed federal-state jurisdictional dispute, it would discuss the motion with the state court, review the files covered by the state court's proscriptive order, decide what, if anything, ought to be produced, notify the state court and the parties, and then deal with any issues respecting production of the documents covered by the state court order. The parties agreed to that approach. After reviewing the documents covered by the state court order, the district court concluded that discovery of the information covered by the state court's order was unnecessary because it added nothing to the facts already known and because of the state's interest in protecting the confidentiality of juvenile files.

Also, by then, thoroughly familiar with the facts of the case, the district court concluded that the record was sufficiently developed to "proceed to summary judgment." The district court then held a scheduling conference and, after consulting with counsel, it set a deadline

for discovery respecting qualified immunity, for discovery of communications between law enforcement officers and Hughes, and for the filing of defendants' motion for summary judgment on qualified immunity. When the parties were unable to agree on the scope of discovery respecting qualified immunity, the district court ordered the discovery of communications between law enforcement officers and Hughes to proceed and deferred decision on the propriety of further discovery until after the defendants had filed summary judgment motions, and after the plaintiffs submitted affidavits under Rule 56(f), if any, in response.

The defendants' summary judgment motion sought dismissal on substantive grounds as well as on ground of qualified immunity. Bruette, not counsel, filed a Rule 56(f) affidavit asserting the need for discovery on the County's policies, practices and customs, to help assess Birch's credibility and to show that those policies, practices and customs had led to the asserted constitutional violations.

We review orders regulating discovery for abuse of discretion. *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002). We find no such abuse here. To the contrary, the district court's approach here was quite reasonable.

Before the district court interceded in the discovery process, it had considered and decided several motions to dismiss under Fed. R. Civ. P. 12(b)(6) and one summary judgment motion and thus was thoroughly familiar with the case and the issues presented. It, therefore, could see, rather readily, that the plaintiffs' own statements cast serious doubt on the viability of their many claims. Confronted with a looming confrontation with a state court and aware of a complaint abundant with facially dubious claims, the district court reasonably assumed its obligation to assess the need for, and the extent of, any further discovery. At the same time, the district court reasonably anticipated that summary judgment motions would be forthcoming on the issue of qualified immunity, which, if granted, would result in termination of the entire action, because the federal claims in the first count would come to an end and the exercise of supplemental jurisdiction over the state law claims likely would not be warranted. Under those circumstances, the district court properly limited the scope of discovery, set a schedule for summary judgment proceedings on the

issue of qualified immunity, and made clear that requests for further discovery would be entertained once the summary judgment motion and a response to it were on file if the plaintiffs' satisfied the requirements of Rule 56(f).

When filed, the defendants' summary judgment motion transcended the issue of qualified immunity and included attacks on the substantive validity on the underlying federal claims, as well as the state law claims. The plaintiffs' response brief underscored the substantive invalidity of all of their claims, thereby undercutting the claimed need for further discovery. And, as the district court correctly held, its decision on summary judgment rendered irrelevant the plaintiffs' request for discovery about the County's practices, policies or customs.

As to the tortious interference claim, the Court already had permitted discovery of communications between law enforcement officers and Hughes. Further, the Rule 56(f) affidavit filed by Bruette did not identify with specificity any further discovery pertinent to that claim. Instead, his affidavit merely recited Burette's undocumented, personal belief that further discovery somehow would show Birch's malice in talking to Hughes about the investigation. That is an insufficient showing to warrant further discovery.[9] *See Strag v. Bd. of Trustees, Craven County, Coll.*, 55 F.3d 943, 953-54 (4th Cir. 1995) (finding that district court did not abuse its discretion in denying Rule 56(f) relief where the moving party "did not specifically allege why the information sought would have been sufficient to create a genuine issue of material fact.").

In sum, the district court fulfilled its obligations to regulate discovery in a case that, by the time of the discovery orders at issue, called out for judicial intervention in the discovery process. We find no error in the district court's reasonable and measured discharge of its obligations.

---

[9]The same infirmity existed as to Bruette's affidavit asserting: (1) the need to review the videotape (which, of course the plaintiffs had viewed in the making and thereafter); and (2) the need to determine — for their negligence claim — J.C.'s "prior involvement" with the County.

The judgment of the district court granting summary judgment and its orders regulating discovery are

*AFFIRMED*.